**ALASKANS FOR A COMMON LANGUAGE, INC.,**
Appellant,

v.

**Moses KRITZ, et al., Appellees.**

**Alaskans for a Common Language, Inc., Appellant,**

v.

**Henry Alakayak, et al., Appellees.**

No. S–10590.

Supreme Court of Alaska.

Nov. 2, 2007.

Kevin D. Callahan and Douglas J. Serdahely, Patton Boggs LP, Anchorage, for Appellant Alaskans for a Common Language, Inc.

Douglas Pope, Pope & Katcher, Anchorage, for Kritz Appellees.

Eric D. Johnson, Association of Village Council Presidents, Bethel; Heather Kendall–Miller, Native American Rights Fund, Anchorage; and William E. Caldwell, Alaska Civil Liberties Union, Fairbanks, for Alakayak Appellees.

Jan Hart DeYoung, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Peter M. Tiersma, Loyola Law School, Los Angeles, California and Nikole Nelson, Anchorage, for amicus curiae Linguistic Society of America.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Alaskans for a Common Language, Inc. appeals from a decision of the superior court that the Official English Initiative, AS 44.12.300–.390, violates speech rights protected by the federal and Alaska Constitutions. We hold that a portion of the statute's principal provision violates constitutionally protected speech. We also hold, however, that this unconstitutional portion of the statute may be severed from the remainder of the principal provision and that the remainder, if given a narrowing construction, is constitutional. We therefore affirm in part, and reverse in part, the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

In 1998 Alaskans for a Common Language, Inc. (ACL), an Alaskan non-profit corporation, sponsored a ballot initiative to adopt English as the state's official language and to require its sole use in "all government functions and actions." The Official English Initiative (OEI or the initiative), entitled "Requiring Government to Use English," was described on the ballot as follows:

This bill requires the state to use English in all government functions and actions. State records must be in English. "The

state" means the legislature, all state agencies, local governments, school districts, public corporations and the university. Those entities may use non-English languages for international trade, emergencies, teaching languages, court suits, criminal inquiries, for elected officials to talk to constituents or to comply with federal law. Costs of non-English records must be identified. Persons who speak only English may not be denied state jobs or services. The bill does not affect private sector use of non-English languages.[1]

The OEI was approved by the voters on November 3, 1998 and was subsequently codified at AS 44.12.300–.390 to become effective March 3, 1999. Accordingly, this case requires us to interpret a statute enacted pursuant to the people's power of the initiative.[2]

Following passage of the initiative, two sets of plaintiffs filed suit against the state to block its implementation. The Kritz plaintiffs consisted of Moses Kritz, Stanley Active, and Frank Logusak, all of whom are lifelong residents of Togiak. Kritz and Active are both public officials, the former proficient in English and Yup'ik and the latter only in Yup'ik. Logusak is a citizen who is fluent in both languages. The Alakayak plaintiffs are a group of Alaska residents from various cities and native villages, many of whom are either bilingual in English and Yup'ik, Inupiaq, or Spanish, or proficient only in their native languages and unable to communicate in English. The lead plaintiff, Henry Alakayak, is a member of the city council for the City of Manokotak who has limited proficiency in English and performs his job exclusively in Yup'ik. Both sets of plaintiffs alleged that implementation of the OEI would adversely affect numerous Alaskans who are themselves bi- or multi-lingual government officials or employees, or citizens who rely on

---

1. The wording of the initiative summary was the subject of a 1998 lawsuit by ACL against then-Lieutenant Governor Fran Ulmer. *See Alaskans for a Common Language, Inc. v. Kritz,* 3 P.3d 906, 910 (Alaska 2000) (describing history of passage of OEI). Ulmer prevailed. *Id.* The quoted excerpt reflects in part the information provided to the voters at the time of the election.

2. ALASKA CONST. art. XI, § 1. The law-making powers granted to the people are similar to those assigned to the legislature. *See* ALASKA CONST art. XII, § 11.

such individuals to communicate with or participate in local and state government.

The cases were consolidated and, in March 1999, Superior Court Judge Fred Torrisi granted the plaintiffs' motion for a preliminary injunction, enjoining implementation of the initiative pending further order of the superior court or of this court. ACL then sought to intervene as a defendant.[3] The superior court denied ACL's motion, explaining that its interests would be adequately represented by the state and that it could advance its positions as an amicus curiae.[4] Noting that some might question whether the state was committed to defending the constitutionality of the initiative in light of unfavorable sentiments expressed by the attorney general's office and then-Governor Tony Knowles,[5] we ordered the superior court to permit ACL to intervene in the lawsuit.[6]

All parties then moved for summary judgment, agreeing that the matter could be resolved without an evidentiary hearing. In March 2002 Judge Torrisi granted the plaintiffs' motions for summary judgment, finding that the OEI violated the free speech clause of the Alaska Constitution because "it is impossible to restrict the initiative's reach to the speech of government as an employer, and because even viewed in this way it is not justified by a legitimate interest." The court further stated that "[t]he wide reach of the initiative chills the exercise of protected speech, and there is no construction that can cure this problem."

The superior court rejected the argument that the initiative was purely symbolic and that it did not prevent anyone from speaking languages other than English, concluding that ACL failed to demonstrate how the initiative could be reasonably construed to permit government employees to routinely speak a language other than English, except in limited circumstances. Relying upon the Ninth Circuit's statement that "[s]peech in any language is still speech and the decision to speak in another language is a decision involving speech alone," [7] the court concluded that the OEI is a restriction on speech that violates the free speech rights of public officials and employees.

With respect to elected officials, the superior court found that the OEI limits their ability to "freely speak" and thus violates article I, section 5 of the Alaska Constitution.[8] As for non-elected employees and officials, the court explained that any restriction on their free speech rights would have to be justified by a "strong [s]tate interest." While the court recognized the validity of the OEI's goals of "promoting, preserving and strengthening" the use of English as Alaska's common language and of reducing the costs of conducting government business in multiple languages, the court found these interests insufficient to justify the "blanket prohibition on public employees speaking languages other than English."

Concluding that the initiative failed to meet the stringent standard required under Alaska law to justify an infringement upon the speech rights of Alaska citizens, the superior court declined to make any findings regarding whether the OEI was content-based or to address the plaintiffs' equal protection arguments. However, the court noted that an overbreadth analysis would lead to the same conclusion because the initiative swept in too much constitutionally-protected speech to be construed narrowly. Finally,

---

**3.** *Alaskans for a Common Language, Inc.,* 3 P.3d at 910.

**4.** *Id.* at 910 & n. 8.

**5.** *Id.* at 913–14.

**6.** *Id.* at 916.

**7.** *Yniguez v. Arizonans for Official English,* 69 F.3d 920, 936 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

**8.** Alaska Const. art. I, § 5 provides: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." The court also observed that the OEI would likely be found to violate the First Amendment of the U.S. Constitution, but determined it to be unnecessary to reach this issue in light of its decision that the initiative violated the rights guaranteed to elected officials under the Alaska Constitution.

the court considered whether the initiative could be saved by severing the unconstitutional provisions and concluded that, while a severed construction "might capture the 'spirit of the measure,'" it was not "evident that voters would prefer the measure as altered." Accordingly, the court declared the Official English Initiative void as violative of article I, section 5 of the Alaska Constitution.

ACL appealed. Following oral argument, we asked the parties to submit supplemental briefing on the issue of severability. The state had declined to participate in the original appeal but, at our request, submitted briefing on the issue of severability.

## III. STANDARD OF REVIEW

 We apply our independent judgment to questions of constitutional law and review *de novo* the construction of the Alaska and federal Constitutions.[9] We also apply our independent judgment to questions of statutory interpretation and "adopt[ ] the rule of law that is most persuasive in light of precedent, reason and policy."[10]

 We review a grant of summary judgment *de novo* and will affirm the judgment if there are no contested issues of

9. *State, Dep't of Revenue v. Andrade,* 23 P.3d 58, 65 (Alaska 2001).

10. *Alaska Gen. Alarm, Inc. v. Grinnell,* 1 P.3d 98, 100 (Alaska 2000) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

11. *Sopko v. Dowell Schlumberger, Inc.,* 21 P.3d 1265, 1269 (Alaska 2001).

12. *Id.* (quoting *Wright v. State,* 824 P.2d 718, 720 (Alaska 1992)).

13. *Id.*

14. ALA CONST amend. 509; Ark.Code Ann. § 1–4–117 (1987); CAL. CONST. art. III, § 6; COLO. CONST. art. II, § 30a; FLA. CONST. ART. II, § 9; GA.CODE ANN. § 50–3–100 (1996); HAW. CONST. art. XV, § 4 (also designating Hawai'ian as official language); 5 Ill. COMP. STAT. 460/20 (1991); IND.CODE. § 1–2–10–1 (1984); IOWA CODE ANN. § 1.18 (West 2002); KY.REV.STAT. ANN. § 2.013 (1984); MISS.CODE ANN § 3–3–31 (1987); Mo. ANN. STAT. § 1.028 (West 1999); MONT.CODE. ANN. § 1–1–510 (1995); NEB. CONST. Art. 1, § 27; N.H.REV.STAT. ANN § 3–C:1 (1995); N.C. GEN.STAT. § 145–12 (1987); N.D. CENT.CODE § 54–02–13 (1987); S.C.CODE ANN. § 1–1–696 (1987); S.D. CODIFIED LAWS ANN. §§ 1–27–20 to 1–27–26 (1995); TENN.CODE ANN. § 4–1–404

material fact and if the moving party is entitled to judgment as a matter of law.[11] In reviewing the superior court's decision to grant summary judgment, we are "not bound by the reasoning articulated by the lower court, and ... can affirm a grant of summary judgment on alternative grounds, including grounds not advanced by the lower court or the parties."[12] We may consider any issue contained in the record, even if not considered by the superior court, in defense of the judgment.[13]

## IV. DISCUSSION

There are now English-only laws in twenty-four states.[14] The content of these laws varies significantly. Some are simply policy statements that English is the state's official language.[15] Others designate English as the language of all official public documents, records or meetings.[16] Still others state that government shall not be required to provide documents, information, or literature in other languages, but permit government employees to communicate in other languages for a wide range of reasons.[17] In stark contrast stand an English-only amendment to the Arizona constitution,[18] a proposed English-only statute in Oklahoma,[19] and the OEI.

(1984); UTAH CODE ANN. § 63–13–1.5 (2000); VA. CODE ANN. § 7.1–42 (1996); WYO. STAT. ANN. § 8–6–101 (1996).

15. *See, e.g.,* ARK.CODE ANN. § 1–4–117 (1987); IND. CODE § 1–2–10–1 (1984); KY.REV.STAT. ANN. § 2.013 (1984); N.C. GEN.STAT. § 145–12 (1987); N.D. CENT.CODE § 54–02–13 (1987); S.C.CODE ANN. § 1–1–696 (1987).

16. *See, e.g.,* N.H.REV.STAT. ANN. § 3–C:1 (1995); S.D. CODIFIED LAWS ANN. § 1–27–20 (1995); TENN. CODE ANN. § 4–1–404 (1984).

17. *See, e.g.,* WYO. STAT. ANN. § 8–6–101 (1996).

18. *See* ARIZ. CONST. art. XXVIII. This provision was struck down first by the Ninth Circuit, *Yniguez v. Arizonans for Official English,* 69 F.3d 920, 924 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), and then by the Arizona Supreme Court. *Ruiz v. Hull,* 191 Ariz. 441, 957 P.2d 984, 987 (1998).

19. *See In re Initiative Petition No. 366,* 46 P.3d 123, 129–30 (Okla.2002) (text of proposed initia-

These three English-only laws share the same basic structure: a declaration that English is the official language of the state, a requirement that only English be used by the state and its political subdivisions, and enumerated exceptions permitting the use of other languages.[20] In its decision striking down the Arizona amendment, the Arizona Supreme Court noted that the law had been characterized as the nation's "most restrictively worded official-English law to date."[21] That court held that the proposed amendment was a pure speech ban that infringed upon the rights of elected officials and public employees to communicate with the public, the rights of non-English speakers to participate in political affairs, and the Fourteenth Amendment's guarantee of equal protection.[22] The Ninth Circuit had earlier reached a similar conclusion when it too struck down the amendment, stating that the amendment's "ban on the use of languages other than English by persons in government service could hardly be more inclusive" because the amendment applied to the legislative, judicial, and executive branches of both state and local government and to "all government officials and employees during the performance of government business."[23] The Oklahoma Supreme Court likewise struck down that state's proposed English-only initiative on state constitutional grounds.[24] The court found that the initiative's broad scope sought "to prevent citizens of limited English proficiency from effectively communicating with government officials and from receiving, when available, vital information about government."[25]

Alakayak and Kritz ask that we strike down the OEI on a constitutional basis similar to that used by the Arizona and Oklahoma courts. To determine whether the initiative is a constitutional regulation of speech we must determine (1) the scope of the law, (2) whether it burdens any constitutionally-protected rights, and, if so, (3) whether it withstands the appropriate level of judicial scrutiny given the nature of the rights it implicates.

Determining the scope of the OEI requires us to construe its meaning. In Part IV.A., we conclude that the first sentence of AS 44.12.320 broadly requires the use of English by all government officials and employees in all levels of government. Next, determining whether the statute burdens any constitutionally-protected rights requires us to evaluate its impact on the rights of private citizens, elected government officials, and government employees. In Part IV.B., we conclude that the same sentence impacts the constitutionally-protected speech of each of these groups. Third, determining whether the OEI withstands the appropriate level of scrutiny is a two-step process. In Part IV.C., we first identify and evaluate the government interest in prescribing the use of English; second, we determine how closely the means chosen by the OEI fit the ends it serves. We conclude that while the OEI serves a compelling governmental interest, the means it uses are not sufficiently narrowly tailored to satisfy the federal or Alaska Constitutions.

In Part IV.D., we consider whether any unconstitutional provisions can be severed to preserve a portion of the law. We conclude that the first sentence of AS 44.12.320 can be severed, allowing the second sentence of that section to stand. Finally, in Part IV.E. we set out the general principles for analyzing the other sections of the law.

tive). The petition was invalidated by the Oklahoma Supreme Court prior to placement on the ballot because the court determined that the petition would be unable to survive a constitutional attack. *Id.* at 125.

20. *See* Ariz. Const. art. XXVIII; *In re Initiative Petition No. 366*, 46 P.3d at 129–30 (text of proposed initiative); AS 44.12.300–.390.

21. *Ruiz*, 957 P.2d at 994 (quoting Michele Arington, Note, *English Only Laws and Direct Legisla-*

tion: *The Battle in the States Over Language Minority Rights*, 7 J.L. & Pol. 325, 337 (1991)).

22. *Id.* at 997–98, 1002.

23. *Yniguez*, 69 F.3d at 932 (quoting Ariz. Const. art. XXVIII, § 2).

24. *In re Initiative Petition No. 366*, 46 P.3d at 129.

25. *Id.* at 127.

## A. The OEI Requires the Use of English in All Government Functions and Actions.

### 1. The language of the statute

The parties vigorously dispute the scope and effect of the law. We begin our analysis with its text:

Sec. 44.12.300. Findings and purpose. The people of the State of Alaska find that English is the common unifying language of the State of Alaska and the United States of America, and declare a compelling interest in promoting, preserving and strengthening its use.

Sec. 44.12.310. Official language. The English language is the official language of the State of Alaska.

Sec. 44.12.320. Scope. The English language is the language to be used by all public agencies in all government functions and actions. The English language shall be used in the preparation of all official public documents and records, including all documents officially compiled, published or recorded by the government.

Sec. 44.12.330. Applicability. AS 44.12.300–44.12.390 apply to the legislative and executive branches of the State of Alaska and all political subdivisions, including all departments, agencies, divisions and instrumentalities of the State, the University of Alaska, all public authorities and corporations, all local governments and departments, agencies, divisions, and instrumentalities of local governments, and all government officers and employees.

Sec. 44.12.340. Exceptions. (a) The government, as defined in AS 44.12.330, may use a language other than English when necessary for the following purposes:

(1) to communicate health and safety information or when an emergency requires the use of a language other than English;

(2) to teach another language to students proficient in English;

(3) to teach English to students of limited English proficiency;

(4) to promote international relations, trade, commerce, tourism or sporting events;

(5) to protect the constitutional and legal rights of criminal defendants;

(6) to serve the needs of the judicial system in civil and criminal cases in compliance with court rules and orders;

(7) to investigate criminal activity and protect the rights of crime victims;

(8) to the extent necessary to comply with federal law, including the Native American Languages Act;

(9) to attend or observe religious ceremonies;

(10) to use non-English terms of art, names, phrases, or expressions included as part of communications otherwise in English; and

(11) to communicate orally with constituents by elected public officials and their staffs, if the public official or staff member is already proficient in a language other than English.

(b) An individual may provide testimony or make a statement to the government in a language other than English, if the individual is not an officer or employee of the government, and if the testimony or statement is translated into English and included in the records of the government.

Sec. 44.12.350. Public accountability. All costs related to the preparation, translation, printing, or recording of documents, records, brochures, pamphlets, flyers, or other material in languages other than English shall be defined as a separate line item in the budget of every governmental agency, department, or office.

Sec. 44.12.360. Non-denial of employment or services. (a) No governmental entity shall require knowledge of a language other than English as a condition of employment unless the requirements of the position fall within one of the exceptions provided in AS 44.12.340, and facility in another language is a bona fide job qualification required to fulfill a function included within one of the exceptions.

(b) No person may be denied services, assistance, benefits, or facilities, directly or indirectly provided by the government, because that person communicates only in English.

Sec. 44.12.370. Private sector excluded. AS 44.12.300–44.12.390 shall not be construed in any way that infringes upon the rights of persons to use languages other than English in activities or functions conducted solely in the private sector, and the government may not restrict the use of language other than English in such private activities or functions.

Sec. 44.12.380. Private cause of action authorized. Any person may bring suit against any governmental entity to enforce the provisions of AS 44.12.300–44.12.390.

Sec. 44.12.390. Severability. The provisions of AS 44.12.300–44.12.390 are independent and severable, and if any provision of AS 44.12.300–44.12.390, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of AS 44.12.300–44.12.390 shall not be affected and shall be given effect to the fullest extent practicable.

### 2. The Meaning of the Statute

ACL argues that the superior court misconstrued the purpose of the OEI, and that the law would have little impact on government because it was never intended as a categorical ban on communication in other languages. ACL claims that any potential constitutional problems can be avoided if we interpret the OEI as requiring the use of English only in the "formal" and "official" acts of government rather than as a categorical ban on speech in other languages in all aspects of government. The superior court, agreeing with Kritz and Alakayak, rejected

ACL's proposed interpretation as unsupported by the text of the initiative itself or by the other ballot materials provided to voters on or before November 3, 1998.

#### a. Principles of statutory construction

Our precedent clearly establishes that "courts should if possible construe statutes so as to avoid the danger of unconstitutionality."[26] To this end, "[a] party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation. A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[27] Thus, if we are able to avoid a finding of constitutional infirmity by construing the OEI to apply only to the "official" acts of government, our case law directs that we must do so. However, we may not read into a statute that which is not there, even in the interest of avoiding a finding of unconstitutionality, because "the extent to which the express language of the provision can be altered and departed from and the extent to which the infirmities can be rectified by the use of implied terms is limited by the constitutionally decreed separation of powers which prohibits this court from enacting legislation or redrafting defective statutes."[28]

While we often look to legislative intent to construe the meaning of ambiguous statutes, we take a slightly different approach when interpreting initiatives enacted by the voters.[29] When we construe a statute, we look at both its plain language and at its legislative history[30] and, whenever possible,

---

**26.** State, Dep't of Revenue v. Andrade, 23 P.3d 58, 71 (Alaska 2001) (quoting Kimoktoak v. State, 584 P.2d 25, 31 (Alaska 1978) (citations omitted) (explaining that "the legislature, like the courts, is pledged to support the state and federal constitutions and that the courts, therefore, should presume that the legislature sought to act within constitutional limits")).

**27.** Id. (quoting Baxley v. State, 958 P.2d 422, 428 (Alaska 1998)).

**28.** State v. Campbell, 536 P.2d 105, 111 (Alaska 1975), overruled on other grounds by Kimoktoak v. State, 584 P.2d 25, 31 (Alaska 1978); see also Gottschalk v. State, 575 P.2d 289, 296 (Alaska 1978) (to imply into statute what is not apparent

on its face "would be stepping over the line of interpretation and engaging in legislation").

**29.** See, e.g., Falcon v. Alaska Pub. Offices Comm'n, 570 P.2d 469, 472 n. 6 (to construe initiative passed by voters, court will look to published arguments for indication of voter intent) (citing State v. Lewis, 559 P.2d 630, 637–38 (Alaska 1977)).

**30.** State v. Alex, 646 P.2d 203, 208 n. 4 (Alaska 1982) (discussing origin of Alaska's "sliding scale approach" to statutory interpretation, in which plain language of statute is considered in light of any accompanying indications of legislative intent).

we construe a statute in light of its purpose.[31] While "[s]tatements made by a bill's sponsor during legislative deliberations are relevant evidence when the court is trying to determine legislative intent[,]"[32] we have also observed that "[w]here a statute's meaning appears plain and unambiguous ... the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent."[33] By contrast, when we review a ballot initiative, we look to any published arguments made in support or opposition to determine what meaning voters may have attached to the initiative.[34] But we will not accord special weight to the stated intentions of any individual sponsor that are not reflected in the content of the legislation itself.[35] To the extent possible, we attempt to place ourselves in the position of the voters at the time the initiative was placed on the ballot, and we try to interpret the initiative using the tools available to the citizens of this state at that time.[36]

ACL has urged this court to consider the affidavits of the OEI's drafters and sponsors as we construe the initiative. Kritz responds that it would be inappropriate to rely on these affidavits as evidence of voter intent because materials which were not published and distributed to the electorate "do not carry the indicia of trustworthiness from having been presumptively distributed to and read by each and every voter." We agree. Because we must construe an initiative by looking to the materials considered by the voters themselves, we cannot rely on affidavits of the sponsors' intent.[37] Accordingly, we will rely only upon materials that Alaska voters had available and would have relied upon to determine the scope and impact of the OEI.

### b. The OEI was presented to voters as an English-only law.

The parties dispute whether the OEI is properly characterized as an English-only law. ACL's statement in support of the initiative stated that "*this bill will have no impact on public or private use of Alaska Native languages,*" that the initiative will impose a limit only on the government, and that "[p]rivate citizens will still be able to use any language they want, anywhere, at any time." (Emphasis in original.) The summary described English as "our official language," "a symbol" which reminds "Alaskans of every race, religion, and background of what we all have in common."

In contrast, the opposition statement of the American Civil Liberties Union (ACLU) warned that, if enacted, the law "will have severe consequences for the many non-English speaking residents and citizens of Alaska." Highlighting some of these consequences, the statement cautioned that the law would not protect the use of Native languages, that it would require government employees to communicate with non-English speakers only in English even if they were able to speak the individual's language, that it would bar non-English speakers from receiving many services to which they are entitled, and that it would violate the constitutional rights of each Alaskan "to speak in the language of their choice," "to petition their

---

**31.** *Beck v. Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 117 (Alaska 1992). In addition, in situations in which "the legislative purpose can be ascertained with reasonable certainty, the maxims of construction ... are secondary to the rule that a statute should be construed in light of its purpose." *Id.*

**32.** *Id.* at 116–17.

**33.** *State v. Alaska State Employees Ass'n/ AFSCME Local 52,* 923 P.2d 18, 23 (Alaska 1996) (quoting *Univ. of Alaska v. Geistauts,* 666 P.2d 424, 428 n. 5 (Alaska 1983)).

**34.** *See Falcon,* 570 P.2d at 472 n. 6 (citing *Lewis,* 559 P.2d at 637–38 (Alaska)).

**35.** *See Alaska State Employees Ass'n/AFSCME Local 52,* 923 P.2d at 24 (refusing to accord weight to stated personal intentions of legislation sponsor that did not reflect content of law as enacted).

**36.** *Cf. Hickel v. Halford,* 872 P.2d 171, 177–81 (Alaska 1994) (attempting to construe term "administrative proceeding" as used in amendment to Alaska Constitution by looking at language of provision, purpose of amendment, statement in support of amendment published in voter pamphlet, and language used in related statutory provisions).

**37.** *Cf. Falcon,* 570 P.2d at 472 n. 6.

government for redress of grievances," and "to equal protection of the laws." We agree.

The OEI, presented to voters as Ballot Measure 6, was entitled "Requiring Government to Use English." The ballot measure contained a neutral summary prepared by the lieutenant governor, a Legislative Affairs Agency summary, a copy of the full text of the proposed statute, a statement in support of the statute drafted by its sponsor ACL, and a statement in opposition to the statute drafted by the ACLU.

The neutral summary stated:

> This bill requires the state to use English in all government functions and actions. State records must be in English. "The state" means the legislature, all state agencies, local governments, school districts, public corporations and the university. Those entities may use non-English languages for international trade, emergencies, teaching languages, court suits, criminal inquiries, for elected officials to talk to constituents or to comply with federal law. Costs of non-English records must be identified. Persons who speak only English may not be denied state jobs or services. The bill does not affect private sector use of non-English languages.[38]

The Legislative Affairs Agency summary explained that the OEI would require each public office, including each office of the state, public corporations and local governments, to use English in all functions, except in eleven enumerated circumstances. It further explained: "A person who is *not a public officer or employee* may make a statement to the government in another language if it is changed into English and made a part of the record." (Emphasis added.) The summary concluded: "The government may not stop the use of another language in a private function. A person may sue to enforce this measure."

### c. The OEI, as enacted, governs more than the "official" or "formal" acts of government.

ACL argues that AS 44.12.310 and .320, when read together, support its argument that the OEI was meant to apply only to the "official" or authorized acts of the State, and prove that the OEI recognizes a "common sense" distinction between "formal" and "informal" acts of government. These sections of the initiative provide:

> Sec. 44.12.310. Official language. The English language is the official language of the State of Alaska.

> Sec. 44.12.320. Scope. The English language is the language to be used by *all public agencies in all government functions and actions.* The English language shall be used in the preparation of *all official public documents and records,* including all documents officially compiled, published or recorded by the government.

(Emphasis added.) According to ACL, if the first sentence of section .320 applied to all acts by government employees, the second sentence would be unnecessary; thus its inclusion plainly modifies the reach of the initiative to govern only "official" state functions. ACL maintains that the OEI's language "plainly contemplates a category of informal, unofficial, written documents which it does not purport to govern." ACL argues in addition that because the OEI contemplates instances in which the government may use informal written materials in languages other than English, it is reasonable to construe the statute to permit informal oral communication in languages other than English as well. While ACL concedes that the government must act through its officers and employees, it claims that the OEI requires only that they use English to the extent that they are carrying out the "government functions and actions" of "public agencies"—that is, only to the extent they are performing official, authorized acts of

---

**38.** ACL objected to the language of the summary, arguing that it incorrectly presented the initiative's enumerated exceptions as exclusive, and that it did not explicitly indicate that the use of Native languages would be protected by the Native American Languages Act (NALA). *See Alas-* *kans for a Common Language v. Kritz,* 3 P.3d 906, 909 (Alaska 2000). Lieutenant Governor Ulmer amended the language describing the exceptions, but her decision not to reference NALA was upheld by the superior court. *Id.* at 910.

government. We disagree regarding the first sentence of AS 44.12.320.

A similar argument was attempted—unsuccessfully—by proponents of English-only laws before the highest courts of both Arizona and Oklahoma. The Arizona court addressed the distinction between "official" and "unofficial" acts of government in *Ruiz v. Hull*,[39] after the Arizona Attorney General, in defending the law, argued that only "official acts of government" would be affected by the implementation of Article XXVIII of the Arizona Constitution (the amendment).[40] While somewhat more broadly applied than the OEI,[41] the amendment similarly provided that English must be the language of "all government functions and actions," [42] that all employees of the state must act in English,[43] and that all government documents must be written in the English language.[44] The attorney general maintained that "the Amendment should not be read to prohibit public employees from using non-English languages while performing their public functions that could not be characterized as official." [45] The court noted the inconsistency of that interpretation with both the language of the amendment, which applied to "all government functions and actions," and with the ordinary meaning of those terms, which "do not impose such a limitation." [46] The *Ruiz* court concluded:

> By its express terms, the Amendment is not limited to official government acts or to the "formal, policy making, enacting and binding activities of the government." Rather, it is plainly written in the broad-

est possible terms, declaring that the "English language is the language of ... *all government functions and actions*" and prohibiting all "government officials and employees" at every level of state and local government from using non-English languages "*during the performance of government business.*" [47]

The Supreme Court of Oklahoma reached a similar conclusion in *In re Initiative Petition No. 366*.[48] The initiative at issue in Oklahoma required that "[a]ll official documents, transactions, proceedings, meetings, or publications issued, which are conducted or regulated by, on behalf of, or representing the state and all of its political subdivisions shall be in the English language." [49] The court construed this provision to "prohibit all governmental communications, both written and oral, by government employees, elected officials, and citizens, of all words, even those which are of common usage, in any language other than English when conducting state business." [50] The court concluded that this restriction prevented non-English speakers from effectively communicating with government officials and from receiving vital information about government.[51]

The same issues are presented in this case. The first sentence of AS 44.12.320 requires the use of English in "all government functions and actions." Because the plain language of the initiative is so clear, ACL "bears a correspondingly heavy burden of

---

**39.** 191 Ariz. 441, 957 P.2d 984 (1998).

**40.** *Id.* at 992.

**41.** Unlike the OEI, the Arizona amendment applied to the judicial branch as well as the legislature and the executive. *See* ARIZ. CONST, art. XXVIII, § 1(3)(a)(i).

**42.** ARIZ. CONST. art. XXVIII, § 1(2).

**43.** ARIZ CONST. art. XXVIII, § 1(3)(a)(iv).

**44.** ARIZ. CONST. art. XXVIII, § 3(1) provides in relevant part:
Except as provided in subsection (2):
(a) This State and all political subdivisions of this State shall act in English and in no other language.
. . . .

(c) No governmental document shall be valid, effective or enforceable unless it is in the English language.

**45.** *Ruiz v. Hull,* 191 Ariz. 441, 957 P.2d 984, 992 (1998).

**46.** *Id.* at 993.

**47.** *Id.* (Emphases in original.)

**48.** 46 P.3d 123 (Okla.2002).

**49.** *Id.* at 127.

**50.** *Id.*

**51.** *Id.*

demonstrating contrary [voter] intent."[52] We next turn to an examination of the ballot materials to determine whether ACL has met this burden.

ACL points to no ballot materials that indicate that the voters might have contemplated distinctions between "official" and "unofficial" or "formal" and "informal" acts of government when they enacted the OEI. The Legislative Affairs Agency summary explicitly stated that, pursuant to the OEI, every public officer or employee of the state would be required to use English in all functions, except in situations governed by the eleven enumerated exceptions. While ACL's statement in support of the initiative claimed that it would limit only government speech and would have no effect on the speech of private individuals, it did not state that the initiative would allow government employees to engage in informal or unofficial conversation with private citizens regarding government business in a language other than English.

Because the meaning of the first sentence of AS 44.12.320 appears plain and unambiguous, and because ACL has not offered sufficient evidence of contrary voter intent, we have no basis to find that the voters shared what ACL calls its "common sense" reading of the initiative. The first sentence of Section .320 plainly mandates the use of English by government officers and employees in the performance of their jobs, whether communicating with English or non-English speakers, except in specific circumstances. Accordingly, we reject ACL's contention that the plain language of the first sentence of AS 44.12.320, permits the "unofficial" or "informal" use of languages other than English by state officials or employees in the performance of their duties.

### d. The second sentence of AS 44.12.320 does not prohibit the use of non-English languages in unofficial or informal public documents.

The same principles we applied to the first sentence of the OEI apply here as well. A "presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[53] If we can save a statute, or part of one, via a narrowing construction, we must do so.[54] This presumption is limited, though, by our reluctance to step into the shoes of the legislature and redraft legislation.[55]

In contrast to the first sentence of .320, the second sentence is capable of a narrow reading that is supported by its text and by the ballot materials. The text of the second sentence includes the word "official," thus "plainly contemplat[ing]," as ACL argues, "a category of informal, unofficial written documents" outside the reach of the OEI. Furthermore, the part of the neutral ballot summary addressing the second sentence of .320 states only, "State records must be in English." It does not require that all state records must be in English, at least suggesting that those state records that are not official are not within the reach of the OEI. Since the text of AS 44.12.320 and the ballot

---

52. *State, Alaska Hous. Fin. Corp. v. Employees Ass'n/AFSCME Local 52,* 923 P.2d 18, 23 (Alaska 1996).

53. *State, Dep't of Revenue v. Andrade,* 23 P.3d 58, 71 (Alaska 2001).

54. *Bonjour v. Bonjour,* 592 P.2d 1233, 1237 (Alaska 1979). As we observed in that case:

Statutes validly enacted by the legislature come to this court with a presumption of constitutionality. If constitutional issues are raised, we have a duty to construe the statute, where it is reasonable to do so, to avoid dangers of unconstitutionality. *Larson v. State,* 564 P.2d 365, 372 (Alaska 1977); *Hoffman v. State,* 404 P.2d 644, 646 (Alaska 1965). Where a narrow construction of a statute will avoid constitutional infirmity without doing violence to the manifest legislative intent, we will interpret the statute accordingly. *Gottschalk v. State,* 575 P.2d 289, 296 (Alaska 1978); *State v. Campbell,* 536 P.2d 105, 110–11 (Alaska 1975); *State v. Martin,* 532 P.2d 316, 321 (Alaska 1975). If a statute is susceptible of no reasonable construction avoiding constitutional problems, this court is under a duty to nullify the statute or, if possible, the particular provision found offensive to the constitution. *Campbell,* 536 P.2d at 110–11. The separation of powers doctrine prohibits us from enacting legislation or redrafting patently defective statutes. *Id.* at 111; *Gottschalk,* 575 P.2d at 296.

55. *Gottschalk,* 575 P.2d at 296 (court cannot "step[] over the line of interpretation and engag[e] in legislation").

materials demonstrate that the second sentence of section .320 is capable of a narrow construction, we are bound by our rules of statutory interpretation to use that construction.

Of what, then, does this "category of informal, unofficial written documents" consist? We agree with ACL's position that the distinction between "official" and "unofficial" is "a conceptual distinction, not a laundry list." Looking at the record, we are met with various examples of documents that appear to be "unofficial" or "informal." They are not published to the public but rather are written for an individual or a private audience. They lack indicia of formality such as seals or binding. They may even be handwritten. This category of unofficial or informal documents would include such documents as a note in Spanish from a teacher to a monolingual Spanish-speaking parent; a letter from a city councilor in Yup'ik responding to a constituent inquiry; a letter in Tlingit from a public health employee offering medical advice; or an invoice prepared in Yup'ik by a city mechanic for services rendered. None of these documents is an "official public document" in the sense that each one is individually tailored, is geared to address a private inquiry, and is generally not released to the public. These enumerated examples are neither exclusive nor comprehensive; nor by the discussion of these specific examples do we mean to provide a definitive holding as to their nature. This case presents, after all, only a facial challenge to the statute.

Furthermore, we construe the second sentence of AS 44.12.320 to mean that multilingual *official* documents are not prohibited so long as an English version of the document is published. The second sentence states that "[t]he English language shall be used" in official documents. The first sentence, in contrast, states that English is "the language" to be used. We take this to mean that the first sentence of AS 44.12.320 intends an exclusivity of English and has a prohibitory function. The second sentence, in contrast, has a permissive aspect, allowing the use of non-English languages in documents so long as English is also used. Thus, the OEI would allow a fisheries notice to be posted in English and Yup'ik; it would allow the Department of Labor and Workforce Development to provide written information in English, Tagalog, and Spanish; and it would allow the Department of Motor Vehicles to give examinations in multiple languages. In keeping with this narrow construction, we believe, contrary to the argument of Alakayak, that the second sentence would not prohibit the publication of "monograms of graduate student dissertations ... children's books written in Yup'ik ... ads and messages placed in the Anchorage Blue Book ... or assorted messages and notes tacked to a community bulletin board in a Yup'ik village." This construction is the basis for our holding that unconstitutional portions of the OEI may be severed from constitutional portions.

**B. Section .320 Impacts Constitutionally–Protected Speech.**

Having determined that the first sentence of AS 44.12.320 broadly requires the use of English by all government officers and employees in all government functions and actions at the state and local levels, we next examine whether this mandate impacts rights protected by the Alaska or federal Constitutions.

The protections for speech provided by the Alaska and federal Constitutions are numerous and sometimes overlapping, and nearly all of them are relevant to official-English laws. The federal Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." [56] The Alaska Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." [57] The Alaska Constitution also provides that "[t]he right of the people peaceably to assemble, and to petition the govern-

---

**56.** U.S. CONST. amend. I.

**57.** ALASKA CONST. art. I, § 5.

ment shall never be abridged." [58] We have previously stated that the Alaska Constitution protects free speech "at least as broad[ly] as the U.S. Constitution" [59] and "in a more explicit and direct manner." [60]

### 1. Section .320 controls more than the content of the government's own speech.

ACL argues that the OEI has no impact on constitutionally-protected speech because the government can determine the content, form, and manner of its own speech. According to ACL, since the OEI governs only government speech, no individual liberty interests are implicated. In support of this argument, ACL cites four U.S. Supreme Court cases [61] for the proposition that "when the state is the speaker, it may make content-based choices ... [because the government may] regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." [62] ACL argues that under this "state-as-speaker" doctrine, the government's ability to "make value, policy, or content choices for its own speech" is "undisputed."

Alakayak acknowledges the state's discretion to control its own speech, but it argues that ACL places more weight on the state-as-speaker doctrine than it can bear. It also disputes ACL's characterization of the OEI as investing a monolithic state government with a single pro-English message conveyed

by every public official, employee, and agency at both the state and local levels at all times.

First, Alakayak argues that ACL mischaracterizes the state-as-speaker doctrine, which Alakayak claims has never been extended further than messages communicated by a narrow sector of government (i.e., the grantees of a single federally-funded program [63] or a specific class of organization, such as universities [64]). Alakayak contends that the OEI, by contrast, requires that the "State speak[ ] with a unitary voice through *all* of its employees and officers *at all times*," thus "chill[ing] all debate and discussion by public officials, employees, and the public, and ... cast[ing] a 'pall of orthodoxy' [65] over our entire system of government and society." Alakayak also argues that the state-as-speaker doctrine would not apply to communications by "all local governments and departments, agencies, divisions, and instrumentalities of local governments," and all their "officers and employees," [66] since they are not typically authorized to speak for the state as its representative, officer, employee, or agent.

Second, Alakayak charges that ACL overreaches in characterizing the OEI as a "message." Alakayak argues that the government "messages" that have been upheld by the U.S. Supreme Court in government-as-speaker cases have been narrow and related to a specific objective of a specific government program.[67] Alakayak argues that the

58. Alaska Const. art. I, § 6.

59. *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982).

60. *Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980).

61. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001); *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

62. *E.g., Rosenberger*, 515 U.S. at 832, 115 S.Ct. 2510 (citing *Widmar v. Vincent*, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) and *Rust*, 500 U.S. at 194, 111 S.Ct. 1759).

63. *E.g., Rust*, 500 U.S. at 193, 111 S.Ct. 1759 (upholding restriction on federal funding for family planning services).

64. *Southworth*, 529 U.S. at 229, 120 S.Ct. 1346; *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510.

65. *Keyishian v. Bd. of Regents of the Univ. of State of New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

66. AS 44.12.330.

67. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (when government disburses funds to private entities to convey its message, it may regulate its own message, but governmental speech was not implicated by state university's decision to fund independent student newspa-

OEI's sweeping scope goes far beyond discrete, affirmative steps to advance the goal of promoting the acquisition of English-language skills, and instead "imposes across-the-board impediments on the ordinary functioning of existing public institutions." Alakayak argues that imposing one message—communication in English—on all state and local government employees distorts the functioning of government entities created to serve entirely unrelated purposes, especially elected bodies, agencies, and schools, in a way never contemplated by the government-as-speaker cases.

 We agree that ACL overstates the scope of the government-as-speaker doctrine. The government actors/speakers in these federal cases were narrowly defined (specific funding grantees,[68] universities [69]) and the government messages and programs involved were specific (family planning; [70] legal representation for welfare clients [71]). This presents a marked contrast to the OEI, in which a "message"—that communication must occur in the English language—is to be conveyed by every state and local government official and employee in every single interaction such persons have with the public. While there are undoubtedly numerous highly specific situations in which the state could invoke the state-as-speaker doctrine to justify a requirement that government speech be in English, these situations would represent only a tiny fraction of the total speech that

the OEI covers.[72] For example, the state could publish all official government documents in English or require driver licensing examinations to be conducted solely in English; but the OEI requires the use of English in virtually every interaction between Alaska's citizens and their government.

ACL's argument, that all speech restricted by the OEI can be characterized as "government speech" subject to the state-as-speaker doctrine, must fail. While we have not previously been required to articulate the contours of the state-as-speaker doctrine, we cannot conclude that the U.S. Supreme Court intended this doctrine to justify a speech ban affecting every elected official and employee in the legislative and executive branches, all departments and offices of state government, and all subordinate local governments. Rather, it appears that the state-as-speaker doctrine governs communications made by a defined group of government employees or agents in the pursuit of narrowly-focused policy goals. Accordingly, the OEI cannot be justified as a limit on the government's own speech.

2. **Section .320 impacts the speech rights of private citizens and government officers and employees.**

Having determined that the OEI is not exempt from scrutiny as a regulation of the government's own speech, we must next de-

---

pers, so state could not refuse to fund newspaper with religious content); *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (federal government may prevent federally-funded family planning programs from discussing abortion with clients if government wishes to promote pregnancy prevention and childbirth as opposed to abortion).

**68.** *Rust,* 500 U.S. at 193, 111 S.Ct. 1759.

**69.** *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000).

**70.** *Rust,* 500 U.S. at 193, 111 S.Ct. 1759.

**71.** *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 540–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001).

**72.** This is especially true of local governments, because they are not merely mouthpieces of the

state. *See* ALASKA CONST. art. X, § 1 (providing for maximum local self-government and liberal construction of powers of local government); ALASKA CONST. art. X, § 11 (home rule borough may exercise all legislative powers not prohibited by law or by charter). While Alaska at one time adhered to the "local activity rule," in which the ordinance of a municipality could conceivably trump a state statute if the subject matter was traditionally considered one of purely local concern, *see Municipality of Anchorage v. Repasky,* 34 P.3d 302, 321 (Alaska 2001) (Bryner, J., dissenting); *Chugach Elec. Assoc. v. City of Anchorage,* 476 P.2d 115, 122 (Alaska 1970), even today, local ordinances that conflict with statutes will be upheld unless they are "substantially irreconcilable" with state law. *Repasky,* 34 P.3d at 321–22 (Bryner, J., dissenting). These principles indicate that while the state government is unquestionably superior, local governments often speak on their own behalf and are not merely "branch offices" that speak on behalf of the state when so ordered.

termine what speech rights it implicates. For the reasons discussed below, we conclude that the OEI impacts the speech rights of three distinct groups: non-English speaking citizens who seek to participate in public life, elected officials, and public employees.

### a. Section .320 impacts the recipient speech rights of non-English speaking citizens and their right to petition the government.

Alakayak and Kritz argue that the OEI infringes the recipient speech rights of Alaska citizens. Recipient speech rights are predicated on the idea that the First Amendment ensures "public access to discussion, debate, and the dissemination of information and ideas."[73] As such, "the Constitution protects the right to receive information and ideas,"[74] because this is "a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press and political freedom."[75] Protection of recipient speech rights was a primary reason that the Arizona and Oklahoma Supreme Courts and the Ninth Circuit struck down the English-only laws in Arizona and Oklahoma.[76] In all three cases, the courts found that the laws impacted the recipient speech rights of citizens with limited English proficiency by preventing them from communicating with bilingual employees who would have been otherwise able and willing to provide them with information about the government.[77] The supreme courts of Ari-

zona and Oklahoma also held that the prohibition constituted an infringement of the right of citizens to petition the government.[78] While those courts were careful to clarify that their decisions in no way conferred a right to multilingual services, they all suggested the importance of a citizen's right to meaningfully receive important information that a government employee was able and willing to provide at no cost to the state.[79] As the Ninth Circuit stated:

> [T]here is no claim of an affirmative right to compel the state to provide multilingual information, but instead only a claim of a negative right: that the state cannot, consistent with the First Amendment, gag the employees currently providing members of the public with information and thereby effectively preclude large numbers of persons from receiving information that they have previously received.[80]

Alakayak urges us to find the OEI unconstitutional on similar grounds because, it asserts, information about government is essential to full participation in civic life, and there are many bilingual or multilingual employees who could willingly provide this information if they were allowed to do so.

Alakayak and Kritz also argue that the OEI restricts the ability of Alaska's citizens to petition their government, a right protected both by the First Amendment to the federal constitution and by article I, section 6 of the Alaska Constitution.[81] Alakayak reasons that because the OEI forbids govern-

**73.** *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *See also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("where a [willing] speaker exists, the protection afforded is to the communication, to its source and to its recipients both").

**74.** *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

**75.** *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (emphasis in original).

**76.** *Yniguez v. Arizonans for Official English,* 69 F.3d 920, 940–41 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Ruiz v. Hull,* 191 Ariz. 441,

957 P.2d 984, 997 (1998); *In re Initiative Petition No. 366,* 46 P.3d 123, 127 (Okla.2002).

**77.** *Yniguez,* 69 F.3d at 940–42; *Ruiz,* 957 P.2d at 997–98; *Petition No. 366,* 46 P.3d at 127–28.

**78.** *Ruiz,* 957 P.2d at 997–98; *Petition No. 366,* 46 P.3d at 127–28.

**79.** *Yniguez,* 69 F.3d at 936–37; *Ruiz,* 957 P.2d at 1002–03; *Petition No. 366,* 46 P.3d at 129.

**80.** *Yniguez,* 69 F.3d at 936–37.

**81.** U.S. Const. amend. I ("Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances."); Alaska Const. art. I, § 6 ("The right of the people ... to petition the government shall never be abridged.").

ment employees from communicating in languages other than English, non-English speakers will face impediments to the full exercise of their right to seek redress for their grievances or even to communicate effectively with government officials. Such obstacles could arise when a non-English speaking citizen attempts to communicate with an elected official or government employee in a language other than English, but the government agent is required to respond in English, even if the agent is conversant in the other language, and even if it is clear that the citizen will not understand what is being communicated.

■ ACL does not address the argument that the OEI restricts the right to petition the government. Rather, it objects to appellees' recipient rights analysis because, it claims, these rights exist only if there is a "willing speaker," which, it asserts, by virtue of the OEI, the state is not.[82] According to ACL, because the law requires government officials and employees to communicate only in English, there is no speaker willing to speak in another language to give rise to a recipient's right to receive a message.[83] ACL's argument is not persuasive.

The trial court's factual findings contain numerous examples of the ways in which multi-lingual government officials and employees assist and provide information to non-English speaking citizens in the course of performing their jobs. For example, Henry Alakayak, a member of the city council and local community school committee in Manokotak, regularly uses Yup'ik in the course of his government duties to assist his village and constituents; several educators indicated that they would not be able to perform their jobs properly if they could not use other languages to communicate with students and parents; and an employee of the Alaska State Ferry System communicates with both co-workers and passengers in Spanish. The pleadings and affidavits submitted by appellees offer numerous additional examples of such behavior.[84]

■ No court has held that a government is constitutionally *required* to provide services to its citizens in a language other than English,[85] and we intimate no such requirement. But it is an altogether different matter whether government may constitutionally prohibit the use of other languages by government employees who are capable and willing to provide services in such languages. A similar sentiment was expressed by Judge Brunetti in his concurrence in *Yniguez:*

> While I feel there may be some tension between the public interest in receiving Yniguez's public services in Spanish as described by the majority, and our prior cases which hold that there is no right to receive government services in a language other than English, our holding today does not conflict with those prior cases....
>
> As the majority carefully describes, we are only considering the *interest·* of the public in receiving speech when govern-

---

**82.** A person has a right to hear speech only if there is a willing speaker. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**83.** *Id.*

**84.** For instance, Manuel Macedo, a middle school teacher, often communicates in Spanish with his students and their parents; James Gilman, a citizen, receives information from state workers regarding benefit programs in Yup'ik; Leo and Ruthie Beaver receive information about their daughter's education from her teachers in Yup'ik; and Minnie Mark, a city coordinator/clerk for the City of Quinhagak, translates for city officials and members of the public doing business with the city both in individual encounters and during public meetings. Similarly, Pe-

ter Lockuk, Sr., a land planner for the City of Togiak, interacts with citizens in Yup'ik, and Kirk Kenrud, the supervisor of the city's Shop & Road Maintenance Department, explains repairs and prepares invoices for non-English-speaking citizens in Yup'ik.

**85.** Numerous federal and state courts have addressed this issue and none has held that such a policy is constitutionally required. *See, e.g., Toure v. U.S.,* 24 F.3d 444, 446 (2d Cir.1994); *Soberal–Perez v. Heckler,* 717 F.2d 36, 41–44 (2d Cir.1983); *Frontera v. Sindell,* 522 F.2d 1215, 1220 (6th Cir.1975); *Carmona v. Sheffield,* 475 F.2d 738, 739 (9th Cir.1973); *Jara v. Mun. Court for the San Antonio Judicial Dist. of Los Angeles County,* 21 Cal.3d 181, 145 Cal.Rptr. 847, 578 P.2d 94, 96–97 (1978); *Guerrero v. Carleson,* 9 Cal.3d 808, 109 Cal.Rptr. 201, 512 P.2d 833, 838–39 (1973).

ment employees exercise *their right* to utter such speech, and we do not create an independently enforceable public *right* to receive information in another language.[86]

We agree with Kritz and Alakayak that the OEI adversely affects the recipient speech rights of Alaska citizens with limited English proficiency, and that it impedes their ability to effectively petition the government.

### b. Section .320 impacts the speech rights of legislators and other elected officials.

The right of elected officials to speak freely and to communicate with their constituents is firmly grounded in constitutional law. In *Bond v. Floyd*[87] the U.S. Supreme Court held that "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."[88] The Court explicitly rejected the argument that the First Amendment protects only free debate about government among citizens, noting that legislators have an obligation to speak about controversial issues to inform and fully represent their constituents.[89] Four justices of this court reached a similar conclusion in finding that the First Amendment protects the right of the governor to write and speak to answer his detractors.[90] The Arizona Supreme Court and the Ninth Circuit struck down the Arizona English-only law in part because it infringed upon the free-speech rights of legislators.[91] The superior court ruled similarly in this case.

Alaska Statute 44.12.340(a)(11) provides a limited exception to the English-only requirement: It allows elected officials and their staffs to communicate orally with their constituents in a language other than English if the speakers are already proficient in the language used. But this exception for oral communication does not allow legislators to exercise their full speech rights to speak with each other in a language other than English, or even to communicate with their constituents if the elected officials are not already proficient in that language;[92] in these respects it violates *Bond v. Floyd*.[93] Moreover, it violates *Thoma v. Hickel* by restricting the ability of elected officials and their staffs to communicate in writing.[94]

ACL does not address *Bond*, but it argues that *Thoma* is irrelevant because, under ACL's "official/unofficial" construction, the OEI touches no protected speech. We have already rejected ACL's contention that the OEI governs only the most formal written acts of government; as discussed in Part IV.A.2., this argument is wholly unsupported by the text of the initiative or the materials presented to the electorate. Because the

---

86. 69 F.3d 920, 957 (9th Cir.1995) (en banc) (Brunetti, J., concurring) (emphasis in original), *vacated as moot sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

87. 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

88. *Id.* at 135–36, 87 S.Ct. 339.

89. *Id.* at 136–37, 87 S.Ct. 339.

90. *Thoma v. Hickel*, 947 P.2d 816, 821 (Alaska 1997) (Matthews, J. & Eastaugh, J., concurring) (governor entitled under First Amendment to respond to critical speech), 826 (Carpeneti, J., dissenting in part, with whom Rabinowitz, J., joined) (governor entitled under First Amendment to respond to critical speech, but not to access confidential public safety criminal database to gather information about critic).

91. *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 940–41 (9th Cir.1995) (en banc), *vacat-*

*ed as moot sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Ruiz v. Hull*, 191 Ariz. 441, 957 P.2d 984, 998 (1998).

92. ALASKA CONST. art. II, § 6 provides that "[l]egislators may not be held to answer before any other tribunal for any statement made in the exercise of their legislative duties while the legislature is in session." This protects neither statements made while the legislature is not in session nor communications with constituents not immediately connected with legislation. *See Schultz v. Sundberg*, 759 F.2d 714, 717 (9th Cir.1985) (Alaska Constitution requires protected activity to (1) be integral part of committee or house proceedings and (2) address proposed legislation or some other topic within legislature's constitutional jurisdiction).

93. 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

94. *See Thoma*, 947 P.2d at 821, 826.

OEI limits the ability of public officials to communicate with each other or their constituents in a language other than English, we hold that it infringes upon their right to speak freely and to fully represent their constituents.

### c. Section .320 impacts the speech rights of public employees.

In *Wickwire v. State*[95] we analyzed the speech rights of Alaska's public employees using the test articulated by the U.S. Supreme Court in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois.*[96] The *Pickering* test assumes that employees have speech rights, and it analyzes speech-related employment decisions by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[97] In contrast to the speech of citizens on matters of public concern, speech by a government employee on matters of only personal interest is generally not thought to enjoy First Amendment protection.[98]

ACL reasons that when a government employee exercises his or her free-speech rights, he or she speaks "as a citizen" and not as an employee; therefore such speech is the employee's *private* speech, which is specifically excepted from the reach of the OEI in AS 44.12.370.[99] According to ACL, because the OEI requires officials and employees to speak only in English when conducting the business of government, it implicates only government speech. Effectively, this

argument reduces to the claim that since the government as employer can control the content of its own speech, and since the OEI requires the government to speak in English, the OEI implicates no private speech. We disagree with ACL's reasoning.

As we noted in Part IV.B.1., the OEI governs more than merely the government's own speech. And a broad *ex ante* prohibition on communication runs afoul of our prior construction of *Pickering*. We have previously noted the difficulty of predicting in advance what types of employee speech will turn out to be protected, stating that "[d]ue to the wide variety of situations in which public employee free speech issues may arise, the [*Pickering*] court expressly declined to establish a general standard against which the statements of all public employees could be judged";[100] rather, *Pickering* articulates a balancing test that is applied on a case-by-case basis.[101]

In addition, Alaska law is more protective of employee speech than is federal law. Shortly after the U.S. Supreme Court in *Connick v. Myers*[102] rejected a public employee's claim that she was fired for commenting on a matter of public concern, and instead characterized her speech as an "employee grievance concerning internal office policy,"[103] we stated that:

> [W]e believe it appropriate to construe the "public concern" criteria broadly to encompass speech on a wide range of subjects. From a public policy standpoint, it makes sense to encourage employee speech about the operations of government since employees often are in the best position to offer informed opinions. Our reading of

**95.** 725 P.2d 695, 700 (Alaska 1986).

**96.** 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**97.** *State v. Haley*, 687 P.2d 305, 311 (Alaska 1984) (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

**98.** *Wickwire*, 725 P.2d at 702 (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**99.** This section provides that: the OEI "shall not be construed in any way that infringes upon the rights of persons to use languages other than

English in activities or functions conducted solely in the private sector, and the government may not restrict the use of language other than English in such private activities or functions."

**100.** *City & Borough of Sitka v. Swanner*, 649 P.2d 940, 943 (Alaska 1982) (construing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

**101.** *Id.*

**102.** 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**103.** *Id.* at 154, 103 S.Ct. 1684.

*Connick* suggests that there may be instances where we would find that certain speech addressed a matter of public concern and was protected under Alaska's Constitution even though a federal claim might yield a contrary result.[104]

Alaska constitutional law posits that a public employee's speech on matters of public concern may indeed be most valuable when contributed by an employee *as an employee*; it does not recognize a strict division between the speaker as citizen and as employee. Because ACL concedes that the intent of the OEI is to restrict the speech of public employees *as* public employees, we conclude that the OEI implicates employee speech rights.

The Ninth Circuit reached a similar conclusion in *Yniguez*, a case in which the named plaintiff was a bilingual state employee who feared disciplinary action if she continued to communicate in Spanish with Spanish-speaking clients.[105] The Ninth Circuit acknowledged that the employee's claims did not fit easily into the *Pickering/Connick* "citizen speech vs. employee speech" framework, precisely because the same speech in Spanish that was of great concern to non-English-speaking members of the public was also the speech that constituted the performance of the employee's official duties.[106] As the Ninth Circuit explained,

> The employee speech banned by the [Arizona amendment] is unquestionably of public import. It pertains to the provision of governmental services and information. Unless that speech is delivered in a form that the intended recipients can comprehend, they are likely to be deprived of much needed data as well as of substantial public and private benefits.[107]

We agree that a wholesale prohibition on speech in languages other than English by all state and local government employees creates an untenable risk of preventing employees from speaking freely on matters of public concern. To the extent that the OEI bars elected officials and public employees from helping citizens secure available services and participate fully in civic life,[108] it touches upon matters of public concern.

Having determined that the OEI infringes upon protected speech, we turn next to whether this infringement may be upheld.

### C. The OEI Is Not Narrowly Tailored To Serve a Compelling State Interest.

Having determined that a provision of the OEI impacts the speech rights of the public, of elected officials, and of public employees, we next address whether the act survives constitutional scrutiny. This is a multi-part inquiry. First, we consider *how* the OEI impacts protected speech, for this will tell us the level of scrutiny to which the law must be subjected. Next, we identify and evaluate the government's interest in prescribing the use of English in communications between government and its constituents. Finally, we determine how closely the means chosen by the OEI fit the ends served by the law.

#### 1. The OEI is subject to strict scrutiny.

How the OEI impacts protected speech determines the state's burden in upholding the law's constitutionality. ACL argues that the OEI affects only the form and not the content of government speech, and that it affects neither the form nor content of citizen speech. Alakayak and Kritz respond that the OEI constitutes a content- and viewpoint-based restriction, as well as a prior restraint, both in its parts and as a whole.

---

**104.** *Wickwire v. State*, 725 P.2d 695, 703 (Alaska 1986).

**105.** *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 924–25, 940 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

**106.** *Id.* at 939–40.

**107.** *Id.* at 940.

**108.** We note that the dissent in *Yniguez* conceded that the English-only law in Arizona "makes it harder for many Arizonans to receive government services. A successful challenge might be raised by those whose ability to deal with their government is thereby impaired." *Id.* at 963 (Kozinski, J., dissenting).

The latitude accorded the government to regulate speech depends upon several factors, including the circumstances involved and the nature of the speech.[109] But because "the principle of content neutrality [is] at the core of First Amendment analysis,"[110] we begin with this issue. It is exceedingly rare that any law restricting speech based on its content or viewpoint will be upheld, for the United States Supreme Court has stated that "[c]ontent-based regulations are presumptively invalid."[111] Such restrictions are subject to the strictest scrutiny, and "only a regulation which impinges on the right to speak and associate to the least possible degree consistent with the achievement of the state's legitimate goals will pass constitutional muster."[112] Restrictions that are content-neutral, on the other hand, are subject to intermediate scrutiny, which means that they are "valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."[113] But even a content-neutral restriction will be subject to strict scrutiny if it imposes a prior restraint on speech.[114] "A prior restraint is an official restriction imposed upon speech or other forms of expression in advance of actual publication."[115] This stands in contrast to a punishment imposed after a communication has been made.[116] Both the federal and Alaska Constitutions look with disfavor on broad-based prior restraint rules that forbid public employees from engaging in wide categories of speech, whether related to their official duties or not; such restraints bear a heavy presumption against their constitutionality because of their chilling effect on potentially protected speech.[117]

Laws prohibiting communication in languages other than English are difficult to categorize. We can readily agree with the Ninth Circuit that such a restriction affects more than conduct, because "[s]peech in any language is still speech, and the decision to speak in another language is a decision involving speech alone."[118] But the question

109. *See, e.g., Marks v. City of Anchorage*, 500 P.2d 644, 647 (Alaska 1972) (listing instances in which speech can be restricted on basis of circumstances involved and type of speech at issue, for example, fighting words, obscenity, and speech in courtroom while court is in session).

110. Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 So. CAL. L.REV. 49, 55 (2000). *See Turner Broadcast Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving expression, consideration and adherence." Consequently, "the First Amendment . . . does not countenance government control over the content of messages expressed by private individuals.") (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)). *See also Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("Nor may the government, we have held, compel conduct that would evince respect for the flag. 'To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind.' "). (Citation omitted.)

111. *R.A.V.*, 505 U.S. at 382, 112 S.Ct. 2538.

112. *Vogler v. Miller*, 651 P.2d 1, 5 (Alaska 1982). *See also Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (reciting federal rule that state "may regulate expressive *content* only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest") (emphasis in original).

113. *Clark v. Comty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

114. *See, e.g., Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).

115. *State v. Haley*, 687 P.2d 305, 315 (Alaska 1984) (citing Emerson, *The Doctrine of Prior Restraint*, 20 LAW & CONTEMP. PROBS. at 648 (1955)).

116. *Id.*

117. *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454, 467–68 & n. 11, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Haley*, 687 P.2d at 315.

118. *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 936 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

whether a law specifying that only one language may be spoken should be classified as content-based is a closer one. The OEI does not present the classic example of a content-based restriction, such as a prohibition on political protest based upon the viewpoint represented [119] or a restriction on sexually explicit television programming.[120] But clearly such a restriction affects more than the form of speech. Communication begins with language, and a non-English-speaking Alaskan could be absolutely precluded from speaking or otherwise communicating with the government by the OEI. As the Arizona Supreme Court noted when confronted with a similar question, a law forcing communication only in English bars communication itself; such a restriction cannot be content-neutral because that designation, "by definition, assume[s] and require[s] the availability of alternative means of communication." [121] Thus, like the Arizona Court, we conclude that the OEI is a content-based restriction on language.[122] But the precise label we attach to the law for analytical purposes is not critical when viewed in light of the OEI's sweeping impact. The OEI prohibits speech itself: It defines a broad category of speech—speech in languages other than English—and simply forbids it.

If all government communications must be in English, some voices will be silenced, some ideas will remain unspoken, and some ideas will remain unchallenged. Such a requirement harms "society as a whole, which is deprived of an uninhibited marketplace of ideas." [123] "Complete speech bans, unlike content-neutral restrictions on time, place, or manner of expression, are particularly dangerous because they all but foreclose alternative means of disseminating certain information." [124] Such a restriction violates the core values protected by the First Amendment and article I, section 5 of the Alaska Constitution.

Because the OEI literally restricts speech itself—both oral and written communications in languages other than English—it must overcome a significant hurdle to justify its constitutionality.[125] Specifically, to withstand constitutional scrutiny the OEI must be narrowly tailored to achieve a compelling government interest.[126] We thus turn to the question whether the State of Alaska has a compelling interest in forbidding the use of languages other than English in the conduct of all government activities.[127]

### 2. The interests underlying the OEI are compelling.

The purpose of the OEI is described in AS 44.12.300, which states:

> The people of the State of Alaska find that English is the common unifying language of the State of Alaska and the United States of America, and declare a compelling interest in promoting, preserving and strengthening its use.

ACL argues that the OEI also serves the goal of "promoting unity among Alaskans

---

119. *See, e.g., Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

120. *See, e.g., U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

121. *Ruiz v. Hull*, 191 Ariz. 441, 957 P.2d 984, 998 (1998).

122. *Id.* at 999.

123. *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).

124. *Ruiz*, 957 P.2d at 999 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996)).

125. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("statutes affecting First Amendment interests [must be] narrowly tailored to their legitimate objectives"); *cf. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 909 (Alaska 2001) ("if 'the objective degree to which the challenged legislation tends to deter [exercise of constitutional rights]' is significant, the regulation cannot survive constitutional challenge unless it serves a compelling state interest") (citation omitted).

126. *Mosley*, 408 U.S. at 101, 92 S.Ct. 2286; *Planned Parenthood*, 28 P.3d at 909.

127. Because we characterize the OEI as a direct prohibition on speech, it is unnecessary to consider the question whether the law also acts as a prior restraint on speech. We note that the superior court did not reach this issue.

with diverse backgrounds through a common language" and of "empower[ing]" Alaska's non-English-speaking population with knowledge of the English language. ACL further claims that the OEI promotes efficiency by limiting "the growth of government services in multiple languages, thereby conserving limited public resources." ACL argues that while some might believe, as did the superior court, that "laws about language don't accomplish much," such a belief "does not provide a constitutional basis to disparage the purposes of the Act as suspect or illegitimate, still less to reject them *a priori* as ineffective." Appellees do not address whether the state's interests in the challenged legislation are compelling.

Courts have historically found a broad range of governmental interests to be compelling. During one recent term alone, the United States Supreme Court acknowledged as compelling the government's interests in promoting racial diversity in education,[128] its interest in protecting children from pornography,[129] and its interest in ensuring fair elections.[130] And this court, in turn, has recently found that the state had a compelling interest in protecting juveniles and curbing juvenile crime,[131] in maintaining order in its jails,[132] and in regulating campaign finance.[133]

Turning to the specific governmental interests involved in this case, courts have recognized the importance of promoting linguistic unity in a diverse society[134] and of helping non-native English speakers to acquire English language skills.[135] As the Supreme Court of Arizona noted in *Ruiz*, "in our diverse society the importance of establishing common bonds and a common language between citizens is clear."[136] That court went on to say, "We recognize that the acquisition of English language skills is important in our society."[137] The importance of English language literacy has been recognized by the United States Congress through legislation regarding naturalization and instruction in English as a second language.[138] And the United States Supreme Court, in a recent decision on access to educational opportunities, noted that "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized."[139] We conclude that the OEI's stated purposes of "promoting, preserving and strengthening" the use of English,[140] encouraging the acquisition of English-language proficiency, and increasing the efficiency of government, are, as stated in the OEI itself, compelling interests. Accordingly, we turn to the question whether the state can achieve its objective through less restrictive means.

### 3. The OEI is not sufficiently narrowly tailored to achieve its ends.

We have held that in order for a law to survive strict scrutiny, it must be narrowly tailored to promote a compelling governmental interest and be the least restrictive means

---

128. *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).

129. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004).

130. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003).

131. *Treacy v. Municipality of Anchorage*, 91 P.3d 252 (Alaska 2004).

132. *Larson v. Cooper*, 90 P.3d 125 (Alaska 2004).

133. *State v. Alaska Civil Liberties Union*, 978 P.2d 597 (Alaska 1999).

134. *See, e.g., Yniguez v. Arizonans for Official English*, 69 F.3d 920, 923 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

135. *See, e.g., Ruiz v. Hull*, 191 Ariz. 441, 957 P.2d 984, 990 (1998).

136. *Id.*

137. *Id.*

138. *See id.* (discussing naturalization legislation, Equal Education Opportunity Act, and Immigration Reform and Control Act).

139. *Grutter v. Bollinger*, 539 U.S. 306, 332, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).

140. AS 44.12.300.

available to vindicate that interest.[141] The government is constrained by how it may pursue its valid objectives: "[T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose."[142] Accordingly, we look to the enumerated goals of the OEI and we consider whether the means employed to reach them are the least restrictive available to do so.

The OEI's first enumerated goal is "promoting, preserving and strengthening the use of English."[143] The means chosen, prohibiting the use of other languages in most instances, is considerably broader than other available alternatives. For example, the state could create and fund programs promoting English as a second language. The goal of arming non-English speakers with knowledge of English[144] could directly be achieved by teaching English to non-English speakers. The goal of conserving public resources by limiting the use of other languages[145] could be achieved by legislation that clearly relieves the state of the responsibility of providing services in languages other than English. We conclude that the prohibition on the use of all languages other than English in the conduct of all levels of government in Alaska is not the least restrictive means available to meet the valid interests of the OEI.

Indeed, not only is the OEI insufficiently narrowly tailored to pass constitutional muster, but the methods it employs in support of its admirable goals may be of questionable efficacy. While the statement in support of the ballot measure noted that "[w]e need to help people learn English," the OEI does not create or expand programs to teach English to non-English speakers, but merely creates an incentive to learn English by making it more difficult for people to interact with their government.[146] Nor does it appear that the OEI will increase efficiency if it prohibits the cost-free use of a language other than English by government officials and public employees.

ACL argued below that it was unnecessary to make provisions for English-language education since other state laws address general and bilingual education. Instead, ACL explained, "the very purpose of AS 44.12.320 and the Law generally is to encourage English-learning by sending a clear message to the public, and by preventing the government from discouraging English-learning by unchecked expansion of non-English services." In *Meyer v. State of Nebraska,*[147] the U.S. Supreme Court held that goals similar to the OEI's were insufficient to justify a law forbidding schools from teaching foreign languages before the eighth grade.[148] "That the state may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; ... but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited

141. *E.g., U.S. v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 804, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *State v. Alaska Civil Liberties Union,* 978 P.2d 597, 603 (Alaska 1999).

142. *Grutter,* 539 U.S. at 333, 123 S.Ct. 2325 (quoting *Shaw v. Hunt,* 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)).

143. AS 44.12.300.

144. "Learning English empowers people to better jobs and to integrate into Alaskan society.... We need to help people learn English, not discourage them." Statement in Support of Ballot Measure No. 6.

145. "[T]his bill will prevent the increased bureaucracy and costs due to offering documents and services in multiple languages.... By making English the official language, we make sure that Alaska will not end up like California, where they offer driver's license exams in 33 languages." Statement in Support of Ballot Measure No. 6.

146. *Amicus* the Linguistic Society argues that many of those who are not proficient in English understand the advantages of learning English, and they participate in classes when they are available.

147. 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

148. *Id.* at 403, 43 S.Ct. 625 (striking down state law prohibiting teaching of foreign languages). While the Court supported the law's goals of promoting "civic development" and ensuring that the English language should become the "mother tongue" of the state's citizens, it struck down the law as an unconstitutional means to achieve those goals. *Id.* at 400–03, 43 S.Ct. 625.

means."[149] Because the OEI attempts to coerce its lawful objectives by methods that conflict with the core protections of the United States and Alaska Constitutions, the law cannot withstand constitutional scrutiny. There are less restrictive ways to promote civic unity and to promote, preserve, and strengthen the use of English. We therefore conclude that ACL has not met its burden of justifying the resulting restrictions on the free speech rights of government officers and employees and the recipients of their speech, and on the rights of citizens to petition their government.

### D. The Unconstitutional Provisions Can Be Severed.

Having decided that the OEI unconstitutionally infringes upon the speech rights of government officials and employees, and that it limits Alaskans' ability to participate fully in public life, we must next determine if the law can be saved by severing any unconstitutional provisions. After oral argument, and in light of our initial reservations about the constitutionality of the OEI's broad reach, we asked the parties to submit additional briefing on whether any potentially unconstitutional provisions of the OEI could be severed.[150] Our review of the parties' helpful briefing on severance has convinced us that the unconstitutional provision of the initiative—the first sentence of AS 44.12.320—may be severed from the remainder of the initiative and that the remainder should be preserved under the standards established by our precedents.

■ A proper measure of respect for lawmaking by the people through the initiative process requires that only those portions of initiated laws that are unconstitutional should be struck down. We have previously held

that striking the whole of an initiative "rather than excising the invalid portion would place an unwarranted constriction on the rights of the people to express their will by popular vote."[151] This is especially true where, as in this case, the initiative contains a severability clause requiring that only offending portions be stricken and that the rest of the law be retained.[152] But severance, as distinct from striking down an initiative in its entirety, is only permissible when established standards are satisfied.

In answering whether this is an appropriate case for severance, we first consider the various severance tests we have used in past cases and determine the proper standard for a statute that has been enacted through the initiative process. We then determine whether the initiative in this case, as redacted, meets those standards.

#### 1. *Lynden Transport* is the test for severability of enacted measures, whatever their source.

■ We originally established standards for determining whether a statute is severable in *Lynden Transport, Inc. v. State*.[153] In that case, we considered a statute that had been enacted by the legislature.[154] The *Lynden Transport* test asks (1) whether "legal effect can be given" to the severed statute and (2) if "the legislature intended the provision to stand" in the event other provisions were struck down.[155] But neither party in this case looks to *Lynden Transport* for the test for severance.

ACL urges that we use the test articulated in *McAlpine v. University of Alaska*[156] and most recently applied in *Alaska Action Center v. Municipality of Anchorage*[157] in determining severability, and the Alakayak appel-

---

149. *Id.* at 401, 43 S.Ct. 625.

150. We were particularly concerned with the first sentence of AS 44.12.320, which states that "[t]he English language is the language to be used by all public agencies in all government functions and actions."

151. *McAlpine v. Univ. of Alaska*, 762 P.2d 81, 94 (Alaska 1988).

152. AS 44.12.390. *See supra* at 192–93.

153. 532 P.2d 700, 713 (Alaska 1975).

154. *Id.* at 702.

155. *Id.* at 713 (quoting *Dorchy v. Kansas*, 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924)).

156. 762 P.2d 81, 94–95 (Alaska 1988).

157. 84 P.3d 989 (Alaska 2004).

lees assume its applicability. In those cases, we were faced with initiative proposals that had not yet been voted upon by the electorate.[158] The *McAlpine* test is substantially similar to the *Lynden Transport* test except in that it also requires us to look to the "spirit of the measure." [159] We have never had the occasion to determine whether the standard applied in *McAlpine* and *Alaska Action Center* for the pre-election review of an initiative should also apply to an initiative after it has been approved by the voters. In other words, we have not decided which severability test to apply to enacted initiatives.

We conclude that there is no compelling reason to apply a different severability analysis to statutes enacted by the people from those enacted by the legislature. Thus, there is no reason that *McAlpine* should apply to enacted initiatives. Whether a statute was enacted by vote of the legislature or vote of the people, the risk involved in severing a statute is that an erroneous judicial reading of the intent of those who enacted the statute will result in a statute that no one wanted. While this risk is real, it is not qualitatively different for a statute enacted by the legislature and one enacted by the voters. Thus, there is no need for a different test.[160]

Several other states treat statutes the same for the purposes of severability regardless of the manner in which the statute was enacted. For example, the California Supreme Court has stated that, in matters of severability, "we can discern no meaningful distinctions between statutes 'enacted' by the people and statutes enacted by the Legislature." [161] Likewise the Washington Supreme Court has stated that it "interpret[s] initiatives based on the same rules of construction we apply to statutes passed by the legislature." [162]

For these reasons, we conclude that the proper test to apply in determining severability of the EOI is that set out in *Lynden Transport*. We turn now to application of that test.

### 2. The redacted initiative satisfies the test for severability.

#### a. The severability clause places the burden on the challengers to show that the *Lynden Transport* test is not satisfied.

█ At the outset it is important to note the consequences of the voters' approval of the severability clause in the initiative, AS 44.12.390.[163] The severability clause places

**158.** *McAlpine*, 762 P.2d at 82. *Alaska Action Center*, 84 P.3d at 990.

**159.** *Alaska Action Center*, 84 P.3d at 995 (quoting *McAlpine*, 762 P.2d at 94–95).

**160.** There is, however, one slight modification of the *Lynden Transport* test that must be made in applying it to an approved initiative. *Lynden Transport's* second part asks whether, following severance, "the legislature intended the provision to stand." *Lynden Transp., Inc. v. State*, 532 P.2d 700, 713 (Alaska 1975). The *McAlpine* test asks whether, after the unconstitutional provision of an initiative is removed, it is evident that "the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety." *McAlpine*, 762 P.2d at 95. This question is appropriate for pre-election severance because the parties with a stake in an initiative *prior* to an election are the initiative's sponsors and subscribers. As *McAlpine* notes, direct democracy would be seriously impeded if sponsors and subscribers could not be confident that their proposals would go before the voters. *Id.* at 92–93. However, after an initiative is enacted, the relevant intent is that of the voters rather than the sponsors and/or sub-

scribers. Thus, for the second prong of the *Lynden Transport* test, we will look to the intent of the voters to determine whether the severed statute can stand on its own.

**161.** *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal.3d 315, 118 Cal.Rptr. 637, 530 P.2d 605, 618 n. 7 (1975).

**162.** *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist., No. 1*, 149 Wash.2d 660, 72 P.3d 151, 168 (2003); *see also Portland Gen. Elec. Co. v. Bureau of Labor & Indus.*, 317 Or. 606, 859 P.2d 1143, 1145–47 & n. 4 (1993); *Abrams v. United States*, 531 A.2d 964, 971 (D.C.1987).

**163.** The statute provides:

Severability. The provisions of AS 44.12.300–44.12.390 are independent and severable, and if any provision of AS 44.12.300–44.12.390, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of AS 44.12.300–44.12.390 shall not be affected and shall be given effect to the fullest extent practicable.

on those challenging the statute the burden of showing that the *Lynden Transport* test is *not* satisfied by a redaction.[164] In *Lynden Transport* we adopted with approval the following language of the United States Supreme Court:

> In the absence of [a severability clause], the presumption is that the Legislature intends an act to be effective as an entirety—that is to say, the rule is against the mutilation of a statute; and if any provision be unconstitutional, the presumption is that the remaining provisions fall with it. The effect of the [severability clause] is to reverse this presumption in favor of inseparability, and create the opposite one of separability. [In the absence of a severability clause], the burden is upon the supporter of the legislation to show the separability of the provisions involved. [In the presence of a severability clause], the burden is shifted to the assailant to show their inseparability....
>
> [With a severability clause], the presumption must be overcome by considerations which establish *"the clear probability that the invalid part being eliminated the Legislature would not have been satisfied with what remains."* [165]

The emphasis was added by the *Lynden* court. We applied this rule in *Kenai Peninsula Borough School District v. Kenai Peninsula Borough School District Classified Association,*[166] where we held that the opponents to a school board collective bargaining ordinance had not shown that the school board "would not have enacted the constitutional portions, had it known that two restrictions would be found unconstitutional." [167]

One justice disagreed with this conclusion but nonetheless agreed with the placement and expression of the burden under a statutory severability clause, concluding "that the record establishes the 'clear probability' that the board 'would not have been satisfied'...." [168] Thus, our analysis begins with the understanding that the burden is on the challengers to show that the voters did not intend the remaining provisions to be given effect.

### b. The remaining provisions of the initiative can be given legal effect.

██ The first part of the *Lynden Transport* test for severability, determining whether "legal effect can be given" to the remaining provisions of the statute,[169] requires us to examine whether the severed statute requires action or if it is merely a statement of public policy.[170] This is a relatively low threshold test that merely requires an enforceable command to implement the law.[171] So, for instance, a statute reduced to the statement that English is the official language of the State of Alaska could not be given legal effect because it would be only a statement of public policy. On the other hand, a statute that required the use of English in all official public documents and records could be given legal effect since it would require action by government officials and employees.

As noted above the OEI must be redacted by severing the first sentence of AS 44.12.320.[172] Thus limited, it would still require that English "be used in the prepara-

---

**164.** 532 P.2d at 711–12.

**165.** *Id.* at 711–12 (quoting *Carter v. Carter Coal Co.,* 298 U.S. 238, 312, 56 S.Ct. 855, 80 L.Ed. 1160 (1936)) (emphasis added in *Lynden Transport*).

**166.** 590 P.2d 437 (Alaska 1979).

**167.** *Id.* at 442.

**168.** *Id.* at 443 n. 1 (Rabinowitz, J., dissenting).

**169.** *Lynden Transp., Inc. v. State,* 532 P.2d 700, 713 (Alaska 1975).

**170.** *See McAlpine v. Univ. of Alaska,* 762 P.2d 81, 94 (Alaska 1988) (initiatives must be used to enact laws, not statements of public policy).

**171.** *Id.*

**172.** The dissent finds fault with this severance, but its concerns are based on a misperception of what this court has done. The dissent mischaracterizes this court's action as "rewrit[ing] section .320," (Dissent at 215) which leads to "a radically rewritten law" (Dissent at 217) with "a newly declared meaning." (Dissent at 216) In truth, the court simply strikes the first sentence of section .320 and gives to the second sentence of that section its plain meaning.

tion of all official public documents and records, including all documents officially compiled, published or recorded by the government." [173] This mandate is consistent with the OEI's purpose of promoting English as the "common unifying language" of Alaskans. Moreover, it would require action on the part of "the legislative and executive branches of the State of Alaska and all political subdivisions," [174] and it could be enforced through a private right of action. [175] Contrary to the suggestion of the dissent, this court does not hold that severance "is justified because the . . . second sentence of section .320 . . . still serves a useful purpose." [176] Rather, the redacted section imposes a substantial obligation on the part of state and local governments, and it reflects the complete scheme that several states have enacted to accomplish their purposes. [177] The first part of the *Lynden Transport* test—if, "standing alone, legal effect can be given to" the provisions that remain after severance of an invalid provision [178]—is clearly met here. [179]

### c. The voters intended the remaining parts of the statute to stand.

The second part of the *Lynden Transport* severability test asks whether the voters "intended the provision to stand" in the event that portions of it were struck down. [180] As we noted in *Sonneman v. Hickel,* "[t]he key question is whether the portion remaining, once the offending portion of the statute is severed, is independent and complete in itself so that it may be presumed that the [voters] would have enacted the valid parts without the invalid part." [181] We answer this question in the affirmative.

First, as discussed above, the initiative contains a severability section: "The provisions of [the act] are independent and severable, and if any provision . . . shall be held to be invalid by a court of competent jurisdiction, the remainder . . . shall not be affected and shall be given effect to the fullest extent practicable." [182] In other words, the voters have told us that they did intend the remaining provision to stand in the event that por-

---

173. AS 44.12.320.

174. AS 44.12.330.

175. AS 44.12.380.

176. Dissent at 220.

177. *See, e.g.,* N.H.Rev Stat. Ann. § 3–C:1 (1995); S.D. Codified Laws Ann. § 1–27–20 (1995) ("[English] is designated as the language of any official public document or record and any official public meeting."); Tenn.Code Ann. § 4–1–404 (1984) ("All communications and publications . . . produced by governmental entities in Tennessee shall be in English."); Wyo. Stat. Ann. § 8–6–101 (1996).

178. *Lynden Transp. Inc. v. State,* 532 P.2d 700, 713 (Alaska 1975).

179. The dissent utterly fails to address the first part of the *Lynden Transport* test. Instead, it faults the court for failing to focus on the initiative's original intent and purpose. (Dissent at 220) But as noted above, the redacted statute still serves the general purpose of the OEI: It promotes English as the "common unifying language" of Alaskans. The statute, by its own terms, states its purpose as "promoting, preserving and strengthening" the use of English in Alaska, AS 44.12.300, and there is no doubt that the redacted statute still serves this purpose and

in so doing tends to promote English as the common language of the state.

The dissent argues that the court takes the second sentence of AS 44.12.320 out of context, suggesting that the court fails to consider whether its "interpretation [does] violence to the initiative's original intent and purpose." (Dissent at 220; *see also id.* at 222 n. 40). But this is clearly not so. The initiative intended to "promot[e], preserv[e] and strengthen[ ]" the use of the English language. AS 44.12.300. There can be no doubt that the severed statute, in requiring that English be used in all official public documents and records, serves these purposes.

Finally, the first part of the *Lynden Transport* test merely requires a court to determine if legal effect can be given to the remaining provisions. But the dissent, in adopting the challengers' view that the severed provision is "the centerpiece of the initiative," concludes that its deletion somehow impermissibly changes the meaning of what remains. (Dissent at 220) This analysis is wrong, for the remaining statute still promotes and strengthens the use of English in the state, and it goes far beyond the first part of the *Lynden Transport* test, which asks only whether the remaining provision can be given legal effect.

180. *Lynden Transp.,* 532 P.2d at 713.

181. 836 P.2d 936, 941 (Alaska 1992).

182. AS 44.12.390.

tions of the initiative were struck.[183] We dealt with a similar provision in *State v. Alaska Civil Liberties Union,*[184] where in reference to a severability clause built into a campaign financing reform act we stated: "The Act contains a severability clause. *Its inclusion indicates that the legislature intended the remainder of the Act to stand if part of it were invalidated.*" [185]

This conclusion is buoyed by our analysis of the overarching purposes of the initiative: unification of our diverse state. In attempting to make English the official language of the state of Alaska, the initiative proceeds on the assumption that a common language is thought to exert a unifying force. As the statement in support noted: "Like our flag, the pledge of allegiance, and our national anthem, English as our official language is our symbol. These symbols remind Americans and Alaskans of every race, religion, and background of what we all have in common." The initiative, as redacted, continues to reflect the voters' belief in the unifying force of a common language and their intent that provisions establishing a common language be upheld "to the fullest extent practicable." [186]

Moreover, the voters had the benefit of the sponsors' statement in the election pamphlet, and it is clear that the sponsors of the initiative—who drafted the severability clause—favored preservation of the constitutional provisions of the initiative. Alaskans for a Common Language has filed a supplemental brief so indicating:

> To the extent this court may now conclude that certain provisions, such as the first sentence of AS 41[44].12.320, might otherwise give rise to an unintended un-

constitutional application of the act, ACL respectfully submits that both the Initiative itself and this Court's precedents require that any such provision should be severed. Such severance, rather than invalidation of the act, would give effect to the meaning of the Initiative as set forth in the Act and its stated purposes as adopted by the voters.

The intent and desire of the sponsors is therefore clear. And apart from the voters' indication of intent in the severability clause, we do know that the initiative was well received. It passed with the approval of more than sixty-eight percent of the voters. It is difficult to construct an argument as to why a version of the initiative shorn of the unconstitutional provisions but still establishing English as the official language of the state and requiring that English be used in all official documents and records would be any less favorably received. The opponents of the initiative before this court have not attempted to make a case as to why this might be so. They have thus failed to meet their burden of showing, by a clear probability, that the voters would not have supported the initiative as redacted.

We conclude that the initiative is severable, because (1) the remaining provisions can be given legal effect and (2) the voters intended that they be given effect. The requirement that the government use English in official documents can be given legal effect and is enforceable. Indeed, as noted, many official English acts in other states are limited to similar provisions.[187] The initiative's challengers have not met their burden of showing the "clear probability" that severance was not intended by the voters.[188] The

---

**183.** In addition to the voters' adoption of a severability clause in the initiative they enacted, Alaska law contains a general savings clause. Alaska Statute 01.10.030 provides:

> Any law ... enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language "If any provision of this Act ... is held invalid, the remainder ... shall not be affected thereby.

We have previously held that the existence of this general savings clause creates a weak presumption in favor of severability. *Lynden Transp.,* 532 P.2d at 712. But the presumption

of severability is stronger where, as here, the statute in question contains a severability clause. *Id.*

**184.** 978 P.2d 597 (Alaska 1999).

**185.** *Id.* at 633 (emphasis added).

**186.** AS 44.12.390.

**187.** *See supra* at n. 178 and accompanying text.

**188.** *See Lynden Transp., Inc. v. State,* 532 P.2d 700, 713 (Alaska 1975).

presumption in favor of severability leads us to conclude that the voters intended that, if a court were to strike the first sentence of AS 44.12.320, the second sentence of that section should stand.

### E. The Remaining OEI Provisions Must Be Construed Narrowly.

In this opinion we have decided the constitutionality of the principle provision of the OEI, AS 44.12.320, striking the first sentence of that section but upholding the second sentence. Because the remaining provisions of the OEI relate to section .320, our holdings as to the constitutionality of that section have implications for the remainder of the OEI. Some provisions may be rendered superfluous or hortatory. Others may present similar constitutional concerns to the ones we thus far have considered. As such the parties may desire that we analyze and parse each line of the OEI in a search for a definitive constitutional ruling on each.[189]

We are mindful, however, that the case comes to us as a facial challenge to the statute. In such cases it is our practice to reserve as many questions for as-applied challenges as possible, in keeping with the legislative policy stated in AS 01.10.030:

> Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the

remainder of this Act and the application to other persons or circumstances shall not be affected thereby."

This provision further animates our decision to sever the unconstitutional provision of the OEI rather than invalidate the entire act. We have consistently severed laws rather than invalidating them when construing this general severability clause.[190] The presence of a specific severability provision in the OEI [191] only strengthens our conclusion in this regard.

■ When we consider the facial invalidity of a statute, we require the party seeking to invalidate the statute to bear the burden of demonstrating the necessity of invalidation.[192] Similarly, a party seeking to invalidate a statute in whole rather than in part bears the burden of demonstrating the unconstitutionality of the entire act.[193] We do not believe that the appellees have met this burden as to the remainder of the OEI.[194]

We are further bolstered in our inclination not to consider each of the other sections of the OEI at this time by the state's apparent willingness to implement the OEI with clarifying regulations, including a regulation to clarify that the second sentence of AS 44.12.320 does not prohibit oral communication between state employees and the public in languages other than English. Any further consideration of the OEI we leave to as-applied challenges, confident that setting out the relevant interpretive principles in this

---

**189.** Indeed, the supplemental briefs of ACL and the state have assumed that we would decide the constitutionality of every section of the act.

**190.** *See, e.g., State v. Alaska Civil Liberties Union,* 978 P.2d 597, 633 (Alaska 1999); *State v. Kenaitze Indian Tribe,* 894 P.2d 632, 639 (Alaska 1995); *State v. Palmer,* 882 P.2d 386, 388–89 (Alaska 1994); *Sonneman v. Hickel,* 836 P.2d 936, 940 (Alaska 1992); *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 94–95 (Alaska 1988); *Lynden Transp., Inc. v. State,* 532 P.2d 700, 715 (Alaska 1975). We construe the OEI's specific severability clause in light of this general policy.

**191.** AS 44.12.390.

**192.** *State, Dep't of Revenue v. Andrade,* 23 P.3d 58, 71 (Alaska 2001) (citing *Baxley v. State,* 958 P.2d 422, 428 (Alaska 1998)).

**193.** *Lynden Transp.,* 532 P.2d at 711–12.

**194.** In light of our discussion of the extent of the English-only requirement imposed by a redacted section .320, *see supra* at 197–98, and given that the current challenge is a facial one and thus there are limited facts before us, we do not believe that the appellees have established at this time that there is a "realistic danger" that sections .340(a)-(b) and .380 will chill the free exercise of speech. *See City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (concluding there must be "realistic danger" statute will significantly compromise First Amendment protections of parties not before court to be facially challenged on overbreadth grounds).

opinion as a guide will assist the parties and the courts to resolve such challenges.

## V. CONCLUSION

Because a portion of the Official English Initiative—the first sentence of AS 44.12.320—violates the federal and Alaska constitutional rights to free speech and to petition the government, we hold that the Official English Initiative is unconstitutional as enacted. Because, however, the unconstitutional provision is severable from the initiative, and the remainder of the section is capable of a constitutional construction, we uphold the constitutionality of the second sentence of AS 44.12.320. We find it unnecessary at this time to consider in greater depth other sections of the law, other than to note that, in the event of a future challenge, they must be construed narrowly if possible to avoid unconstitutionality. We thus AFFIRM in part, and REVERSE in part, the judgment of the superior court.

BRYNER, Chief Justice, dissenting.

I agree with today's ruling that section .320 of the Official English Initiative is unconstitutional because it violates protected freedoms of speech. But I do not agree that this infirmity can be cured by severing the section's first sentence and giving the remaining language of the section—and the entire initiative as well—a new meaning that conflicts with its plain meaning as originally enacted. Nor do I agree that the court's decision to rewrite section .320 can justify its refusal to recognize and address the obvious overbreadth problems left unresolved in the initiative's remaining provisions. Because section .320 is the initiative's keystone provision, because its original purpose and meaning are plainly unconstitutional, and because no court has the power to redraft an invalid statute, I believe that the constitution requires us to strike the initiative in its entirety.

## I. SALVAGING THE INITIATIVE

### A. Narrowing Construction

As the court recognizes in Part IV.A.2.b of its opinion, the Official English Initiative

(OEI) was presented to the voters as an English-only law. The core provisions of the initiative are sections .320, "Scope," which describes when English must be used, and .340, "Exceptions," which specifies when languages other than English are allowed.[1] Section .320 sweepingly extends the English-only requirement to all functions and actions performed by government officials and all written materials they prepare:

> Sec. 44.12.320. Scope. The English language is the language to be used by all public agencies in all government functions and actions. The English language shall be used in the preparation of all official public documents and records, including all documents officially compiled, published or recorded by the government.

Section .340 then describes eleven limited purposes for which government officials may use other languages "when necessary"; it also specifies that private citizens who address government officials may communicate in a language other than English, but only if their statements are translated into English:

> Sec. 44.12.340. Exceptions. (a) The government, as defined in AS 44.12.330, may use a language other than English when necessary for the following purposes:
>
> (1) to communicate health and safety information or when an emergency requires the use of a language other than English;
>
> (2) to teach another language to students proficient in English;
>
> (3) to teach English to students of limited English proficiency;
>
> (4) to promote international relations, trade, commerce, tourism or sporting events;
>
> (5) to protect the constitutional and legal rights of criminal defendants;
>
> (6) to serve the needs of the judicial system in civil and criminal cases in compliance with court rules and orders;
>
> (7) to investigate criminal activity and protect the rights of crime victims;

---

1. AS 44.12.320, .340.

(8) to the extent necessary to comply with federal law, including the Native American Languages Act;

(9) to attend or observe religious ceremonies;

(10) to use non-English terms of art, names, phrases, or expressions included as part of communications otherwise in English; and

(11) to communicate orally with constituents by elected public officials and their staffs, if the public official or staff member is already proficient in a language other than English.

(b) An individual may provide testimony or make a statement to the government in a language other than English, if the individual is not an officer or employee of the government, and if the testimony or statement is translated into English and included in the records of the government.

All members of the court, including myself, agree on the intended meaning and dominant purpose of these provisions. Today's opinion correctly rejects the argument of Alaskans for a Common Language, Inc. (ACL) that we should read the initiative leniently, so that it applies only to "formal" and "official" documents and records. As the opinion states in concluding that section .320 as a whole cannot be read leniently:

Because the meaning of the first sentence of AS 44.12.320 appears plain and unambiguous, and because ACL has not offered sufficient evidence of contrary voter intent, we have no basis to find that the voters shared what ACL calls its "common sense" reading of the initiative. The first sentence of section .320 plainly mandates the use of English by government officers and employees in the performance of their jobs, whether communicating with English or non-English speakers, except in specific circumstances [enumerated in AS 44.12.340(a)]. Accordingly, we reject ACL's contention that the plain language of the first sentence of AS 44.12.320 permits the "unofficial" or "informal" use of languages other than English by state officials or employees in the performance of their duties.

All members of the court further agree that, so construed, the initiative's requirements impinge on constitutionally protected rights of free speech and are therefore invalid. Yet despite this understanding of section .320's "plain and unambiguous" meaning, the court proceeds to give the second sentence of section .320 precisely the meaning that it just rejected for the section as a whole.

Because the second sentence of section .320 refers to "official" documents and records, the court reasons, it is "capable of a narrow reading," which, in the court's view, plainly contemplates a permissible category of "informal, unofficial written documents" outside the reach of the OEI. The court also points out that the initiative's neutral ballot summary stated that "[s]tate records must be in English"; in the court's view, because this wording fails to specify that "all records must be in English," it "at least suggest[s] that those state records that are not official are not within the reach of the OEI." Finally, the court finds nuanced meaning in subtle phrasing differences between section .320's two directives to use English: the first sentence directs that "[t]he English language is the language to be used," while the second directs that "[t]he English language shall be used." The court takes this difference in the two otherwise clear directives as showing "a permissive aspect" in the second sentence—an aspect "allowing the use of non-English languages in documents so long as English is also used."

Through the narrow opening created by these infinitesimal textual gaps, the court leaps immediately to the conclusion that, because doubtful meaning should be resolved in favor of constitutionality, it has a duty to adopt this artificially narrow reading of the second sentence. The court makes no effort to first determine whether this meaning is textually or contextually plausible. Given the second sentence's newly declared meaning, the court leaps once more to conclude that the entire initiative can be rescued from unconstitutionality by severing the first sentence of section .320 and allowing the second to stand—again making no attempt to ask first whether the severed statute it adopts makes any sense in light of the primary

purpose and dominant intent underlying the initiative's original version.

This interpretive process results in a radically rewritten law that bears no realistic semblance to the version originally presented to and enacted by Alaska voters. By the court's own account, the initiative started out, and was sent to the voters, as a comprehensive and inflexible English-only law that covered the entire universe of government communications—spoken and written—and ranked among the nation's "most restrictively worded official-English law[s] to date." [2] Yet as revised by the court, this law has now morphed into a modest and permissive measure that welcomes the use of all languages in all government functions and actions, spoken and written, as long as the government makes sure to keep an English version of "official documents and records" (whatever the court might later define that phrase to mean). Put simply, a law originally meant to say "English only and always (except as necessary in a few specified situations)" now says "English sometimes but not always or only—and we can't tell yet exactly when."

In my view, this interpretation makes no sense, and its adoption violates settled principles governing statutory construction and severance of unconstitutional language. Our duty to construe statutes in a way that avoids a finding of unconstitutionality is firmly constrained, as the court notes, "by the constitutionally decreed separation of powers which prohibits this court from enacting legislation or redrafting defective statutes." [3] Accordingly, we are authorized to use narrowing constructions as a way of avoiding unconstitutional results only where it is reasonable to do so.[4] And we have recognized that a narrowing interpretation will be reasonable only if it can be adopted without doing violence to

the manifest legislative intent of the statute at issue.[5] To this end, in determining the reasonable meaning of a law, courts regularly look for guidance to the "fundamental canon of statutory interpretation that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." [6] In other words, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." [7]

In reflexively giving the second sentence of section .320 the narrowest meaning it could possibly have in the first sentence's absence, today's opinion completely forgets to apply these prudential rules by ignoring the second sentence's meaning in its original context— the meaning that sentence had as an integral part of section .320 as a whole as that provision appeared in its original form. The court's interpretation of the second sentence in isolation from the first is consequently unsound—both textually and contextually.

As a textual matter, there is simply no basis for the court's assumption that the second sentence's reference to "official" documents implies a permissible category of "informal, unofficial written documents" outside the reach of the OEI. The court's assumption ignores a simpler and more likely meaning of "official documents and records"—that is, all documents and records prepared or retained by government employees in performing their official functions and actions. Indeed, the restricted meaning proposed by the court quickly becomes implausible when carried over to other parts of the initiative. If we accept the court's proposed interpretation of the word "official," parallel logic would advise us to read section .310's broad declaration

---

**2.** *Ruiz v. Hull,* 191 Ariz. 441, 957 P.2d 984, 994 (1998) (quoting Michele Arington, Note, English-Only Laws and Direct Legislation: The Battle in the States Over Language Minority Rights, 7 J.L. & Pol. 325, 337 (1991)).

**3.** *State v. Campbell,* 536 P.2d 105, 111 (Alaska 1975), *overruled on other grounds by Kimoktoak v. State,* 584 P.2d 25, 31 (Alaska 1978).

**4.** *See Bonjour v. Bonjour,* 592 P.2d 1233, 1237 (Alaska 1979) (citing *Larson v. State,* 564 P.2d 365, 372 (Alaska 1977)).

**5.** *State v. Blank,* 90 P.3d 156, 162 (Alaska 2004); *see also Bonjour,* 592 P.2d at 1237.

**6.** *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (citing *United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984)).

**7.** *Allied Chem. Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 185, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (citations omitted).

that "[t]he English language is the *official* language of the State of Alaska" [8] as implying the existence of an informal, unofficial language outside the reach of the OEI—a meaning that nobody has even thought to propose.

Moreover, section .320's second sentence incorporates other wording that rules out the court's proposed interpretation of "official" documents and records. Specifically, the second sentence requires English to be used not just in "all official public documents and records," as today's opinion suggests, but rather "*in the preparation of* all official public documents and records." [9] Accordingly, the text of the second sentence evinces an unambiguous intent to extend its English-only requirement to all informal writings that precede the government's "formal" public documents and records.

The second sentence's surrounding context points to the same conclusion. As already noted, the first sentence of section .320 unequivocally extends the initiative's English-only requirement to all actions and functions performed by government officers and employees. Because writing performed in the course of government work falls within the meaning of government "functions and actions," the first sentence of section .320 would normally extend its English-only requirement to all writings produced in the course of government employment, regardless of the second sentence's presence. Given the first sentence's broad reach, the second sentence can best be understood, not as a sentence that covers the act of writing, but rather as one that covers the government's preparation and retention of writings produced by or submitted to the government for public use.

While the two sentences may well overlap to a considerable extent when read in this way, the second sentence nonetheless served a valuable purpose in its original context— that is, as part of an initiative designed to apply a strict English-only requirement. By cementing the point that all writings produced by government functions and actions or submitted from other sources must always stay in English if they are to be kept as public records and documents, this sentence closes any potential gaps left open by the first. When construed in context with the original initiative as a whole, then, including its sibling first sentence, the second sentence originally meant to strengthen, not to dilute, the force of the first.

Indeed, the court's own expressed understanding of "the plain language of the first sentence of AS 44.12.320 conflicts with its proposed narrow reading of the section's second sentence." The court properly concludes that section .320 is incapable of being read in its entirety to "permit[] the 'unofficial' or 'informal' use of languages other than English by state officials or employees in the performance of their duties." Given this conclusion, the court's proposal to read the second sentence of the section as having precisely that meaning would make no sense in the sentence's original context. Thus, as now adopted, this narrow meaning does violence to the manifest original purpose of section .320.

A different contextual anomaly arises between the court's proposed narrow meaning of section .320 and the plain meaning of section .340. As we have seen, section .320 sets out the "scope" of the initiative's English-only requirement by defining the circumstances in which English must be used, while section .340 defines the permissible uses of other languages by adopting an exclusive list of specific "exceptions" that can be invoked only "when necessary." [10] Because section .340's exceptions encompass situations involving both written and spoken language, the court's proposed reading of section .320 would have a paradoxical effect on section .340: as a "permissive" provision "allowing the use of non-English languages in documents so long as English is also used," section .320's provisions governing writings would become broader than section .340's exceptions, thus turning the exceptions into restrictions.

---

8. AS 44.12.310 (emphasis added).

9. AS 44.12.320 (emphasis added).

10. AS 44.12.340(a).

In short, because the court's proposed reading of section .320's second sentence is textually implausible, contextually unreasonable, and does violence to the manifest legislative intent of section .320 and the initiative as a whole, that narrow meaning fails to offer a viable path for avoiding the provision's unconstitutionality. Other courts considering nearly identical English-only provisions in the only two other states where they were adopted or proposed have not hesitated to strike them as facially unconstitutional.[11] Neither should we. As we have previously ruled on similar occasions, "at some point, it must be assumed that the legislature means what it says."[12]

### B. Severance

Separate problems arise from the court's attempt to invoke severance as a means to enact its recrafted version of section .320's second sentence. This court's authority to sever unconstitutional provisions from an act derives from the same source as its power to adopt narrowing constructions: the court's duty to uphold a statute as constitutional whenever the result is reasonably possible. As Sutherland explains, "[t]he courts recognize a duty to sustain an act whenever this may be done by proper construction, and extend the duty to include the obligation to uphold part of an act which is separable from other and repugnant provisions."[13]

By the same token, the court's severance powers are restrained by the same constraints that fence its powers to adopt limiting constructions: "If a court finds a statute or portions of it unconstitutional, it has the power to strike it down or sever the invalid portion. It does not have the power to redraft the statute as that is the province of the legislature."[14] Thus, not only must the remaining portion of a severed statute be "valid as a law by itself,"[15] but it must also "give effect to the apparent intention of the legislature" that enacted the original provision.[16] Just as a court must do when it considers adopting a narrowing construction, a court contemplating severance must initially determine that "severing the invalid portion will not do violence to the intent of the legislature."[17] If the court determines instead that "by sustaining only a part of a statute, the purpose of the act is changed or altered, the entire act is invalid."[18]

In keeping with these principles, our severance cases have often observed that, for purposes of determining whether the legislature would have wanted to enact the remaining portion of a severed statute, the critical inquiry is whether the severed portion remains faithful to the "primary intent,"[19] "dominant purpose,"[20] "spirit,"[21] or "primary goal"[22] of the entire act as originally enacted.[23] We have emphasized that "[i]n

---

**11.** *See Yniguez v. Arizonans for Official English,* 69 F.3d 920, 936 (9th Cir.1995) (en banc), *vacated as moot sub nom. Arizonans for Official English v. Arizona,* 520 U.S. 43, 48–49, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *In re Initiative Petition No. 366,* 46 P.3d 123, 129 (Okla.2002).

**12.** *Gottschalk v. State,* 575 P.2d 289, 296 (Alaska 1978) (quoting *Campbell,* 536 P.2d at 111).

**13.** Norman J. Singer, Statutes and Statutory Construction § 44:1, at 549 (6th ed., rev.2001).

**14.** *Id.* § 44:1, at 549–50 (footnote omitted); *see also Gottschalk,* 575 P.2d at 296.

**15.** Singer, *supra* note 13, § 44:4, at 561–62.

**16.** *Duryee v. United States Dep't of the Treasury,* 6 F.Supp.2d 700, 706 (S.D.Ohio 1995); *see also Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (court has duty to ensure the severed statute will "function in a *manner* consistent with the intent" of the legislature) (emphasis in original).

**17.** Singer, *supra* note 13, § 44:3, at 554.

**18.** *Id.* § 44:7, at 583.

**19.** *Lynden Transp., Inc. v. State,* 532 P.2d 700, 715 (Alaska 1975).

**20.** *Id.* at 719 (Rabinowitz, C.J., concurring in part, dissenting in part).

**21.** *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 94 (Alaska 1988); *see also* Singer, *supra* note 13, § 44:3, at 558–59 ("Likewise the so-called 'spirit' of an enactment is a term meaning essentially the legislative intent, although it may be somewhat broader, involving also the 'purpose' of the enactment." (footnotes omitted)).

**22.** *McAlpine,* 762 P.2d at 95.

**23.** Conversely, when approving severance we have sometimes emphasized that the "deleted subsection is a minor part of the overall act."

the final analysis, a court must endeavor to fathom the legislative intent from all sources available to it." [24] This focus makes eminent sense because, unless the remaining provisions are faithful to the intended meaning of the original measure, they will amount to an impermissible judicial revision of the original law.[25]

Yet here, in deciding to sever the first sentence of section .320, reconstrue the second, and leave the rest of the initiative intact, the court never once stops to consider the effects of its ruling on the initiative's original intent and dominant purpose, which openly conflict with the intent of the severed initiative's remaining provisions. After all, as the court itself acknowledges early on in its opinion, the original initiative meant to impose a uniquely stringent and all-encompassing English-only requirement on all government communication. In contrast, the revised law as it now stands freely allows government communication in any language for any purpose, as long as English versions of "official" records and documents are kept. Moreover, as the court admits, its interpretation of section .320 makes other provisions of the initiative "superfluous or hortatory"—a classic sign of changed meaning and improper severance.

Instead of focusing on the initiative's original intent and purpose, the court's opinion seems to suggest that severance is justified because the newly interpreted second sentence of section .320 now has a constitutionally permissible meaning and still serves a useful purpose. But as I have already explained, the court minted its new interpretation of the second sentence after striking the

first sentence, and without initially asking whether the interpretation did violence to the initiative's original intent and purpose; had the court stopped to ask, it would have found that its permissive reading of the second sentence conflicts with the basic purpose that the initiative was intended to serve—to impose a strict English-only requirement on all government speech. Because of this conflict, it is "bootstrapping" [26] for the court to use severance as a means to enable it to give the second sentence of section .320—and the redacted section as a whole—a new meaning that the original initiative never meant to enact.

*Gottschalk v. State*[27] illustrates the proposition. There, the legislature had defined a criminal defamation law to include an overbroad culpable mental state requirement. On appeal, the state urged this court to sever the overbroad provision and construe a related provision of the statute as incorporating a constitutionally permissible mens rea requirement.[28] Characterizing the state's argument as a request for "radical reconstruction" that asked us "to undertake a wholly inappropriate judicial activity amounting to judicial legislation," [29] we declined the request:

> We recognize the rule of construction that where it is reasonably possible to do so, statutes should be construed in a manner consistent with constitutional requirements. Here, however, as in *Campbell* ..., we are not able to save the statute in question because in doing so we would be stepping over the line of interpretation and

*Sonneman v. Hickel,* 836 P.2d 936, 941 (Alaska 1992).

24. *Lynden Transp.,* 532 P.2d at 715.

25. *See, e.g., Women's Emergency Network v. Bush,* 323 F.3d 937, 948–49 (11th Cir.2003) (holding that the unconstitutional portion of a Florida law authorizing the state's "Choose Life" special license plate program—which provided that collected fees would be distributed to organizations that promoted adoption over abortion—was not severable because the legislative purpose of the program was to promote adoption instead of abortion).

26. *See Campbell,* 536 P.2d at 111 ("We cannot 'bootstrap' the wrongful intent requirement into the statute by the wholesale implication of other necessary elements. At some point, it must be assumed that the legislature means what it says and that, in fact, in this instance, it was trying to delineate a new statutory offense. There is nothing, of course, inherently unconstitutional about purposeful omission of [a particular] requirement.").

27. *Gottschalk,* 575 P.2d at 294–95.

28. *Id.* at 296.

29. *Id.*

engaging in legislation.[30]

Today's opinion leans heavily on the initiative's express severance clause and the general severance preference appearing in the Alaska Statutes. The opinion seems to suggest that the electorate's expressed preference for severance somehow confers special powers on the court to rely on the severance doctrine when its use might otherwise be barred. But the court misunderstands the limited role of a severance clause. A general severance law like AS 01.10.030 [31] or a specific severability provision like AS 44.12.390 [32] simply works to override the traditional presumption against severance by establishing a presumption in favor of severance.[33] Because legislative powers are not delegable and belong to the legislature or the voters, severance clauses do not bestow courts with any substantive authority to sever. As Sutherland explains, "it should be kept in mind that the authority of a court to eliminate invalid elements of an act and yet sustain the valid elements is not derived from the legislature, but rather flows from powers inherent in the judiciary." [34] Nor do severance clauses establish a specific legislative intent as to particular statutory provisions; at most, they merely create a "slight" generalized preference that helps guide the court when more specific evidence concerning the legislature's actual intent is close:

It would seem that the soundest interpretation of this language [discussing preference clauses] is that, whereas a specific severability clause creates a slight presumption in favor of severability, a general clause creates an even weaker presumption. For all practical purposes, the difference between the two is negligible.[35]

In each case, then, courts must look to the totality of the evidence bearing on "the content of the measure and the circumstances surrounding its proposal" [36] in order to decide the legislature's likely intent on the particular severance question at issue: "[i]n the final analysis, a court must endeavor to fathom the legislative intent from all sources available to it." [37] And as previously mentioned, this endeavor typically begins by centering on the "primary intent" and "dominant purpose" of the original enactment.[38]

Today's opinion completely fails to undertake this endeavor. The closest it comes are its brief discussion of the "overarching" symbolic importance that an official-English measure can have; its description of the fervent plea for severance advanced in ACL's supplemental brief; and its cryptic reference to the initiative's opening provision, AS 44.12.300, which broadly finds that "English is the common unifying language of the State of Alaska and the United States of America," and then "declare[s] a compelling interest in

**30.** *Id.; cf. State v. Zarnke*, 224 Wis.2d 116, 589 N.W.2d 370, 377 (1999) ("While when necessary, we have at times severed portions of a statute's language, and at other times have read into a deficient statute a constitutional requirement, the State's request that we save all of [the challenged law] would require this court to combine two distinct saving doctrines, which we are not inclined to do under the circumstances of this case.").

**31.** Alaska's general severance statute, AS 01.10.030, provides as follows:

Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be affected thereby."

**32.** The initiative's severability clause, AS 44.12.390, states:

The provisions of AS 44.12.300–44.12.390 are independent and severable, and if any provision of AS 44.12.300–44.12.390, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of AS 44.12.300–44.12.390 shall not be affected and shall be given effect to the fullest extent practicable.

**33.** *Lynden Transp.*, 532 P.2d at 711–12.

**34.** Singer, *supra* note 13, § 44:8, at 589.

**35.** *Lynden Transp.*, 532 P.2d at 712–13.

**36.** *McAlpine*, 762 P.2d at 94–95.

**37.** *Lynden Transp.*, 532 P.2d at 715.

**38.** *Id.* at 715, 719 (Rabinowitz, C.J., concurring in part, dissenting in part).

promoting, preserving and strengthening its use." But the court's approach mistakes the initiative's abstract statement of hopes and aspirations for the concrete "content of the measure and the circumstances surrounding its proposal." [39] The voters' likely intent in enacting the initiative must be realistically gauged by what the initiative's substantive provisions actually do, not by the aspirational goals the voters eventually hope to attain. [40]

The danger posed by the court's approach lies in the inevitable temptation it creates to overreach the limits of judicial power by trying to redraft an initiative to mean something that the court believes the voters would have wanted to enact had they proposed a constitutionally valid measure. The court in effect converts ACL's sincere desire to do *something* constitutional along the initiative's general lines—its fervent wish to adopt *some* valid form of "official-English" measure if its "English-only" initiative would not pass muster—into a mandate to engage in judicial legislation. The institutional harm of succumbing to this temptation is that it leads to public laws drafted and enacted by judges—a power that the Constitution does not confer on the judicial branch, but always allows the legislature and the voters to pursue for themselves.

This type of danger, and the need to avoid it, was recognized and aptly described in *State v. Zarnke*,[41] a decision of the Wisconsin Supreme Court in a criminal appeal raising severance issues similar to the ones we considered in *Gottschalk v. State*.[42] In *Zarnke*, the court addressed a challenge to a recently enacted criminal law that shifted the burden of proof from the state by requiring the defendant to prove the absence of guilty knowledge.[43] The trial court had dismissed the state's charge against Zarnke, concluding that the law was unconstitutional under the legal theory charged in his case.[44] In the intermediate court of appeals, the state conceded the law's unconstitutionality but convinced the intermediate court to sever the provision of the law imposing the unconstitutional burden and to construe the law's remaining provisions as incorporating the conventional requirement giving the state the burden of proving the element of guilty knowledge beyond a reasonable doubt.[45]

The Wisconsin Supreme Court granted *Zarnke's* petition to review the intermediate court's severance ruling.[46] The state then renewed the severance argument it had raised below, but it advanced a new theory to support the argument, urging the court to rule that, even though the legislature had clearly intended to adopt the current law's allocation of burdens, it was nevertheless proper to sever the invalid provision and reinterpret the law's remaining provisions because the legislature's underlying intent had been to enact the most rigorous guilty-knowledge requirement that the constitution would permit.[47]

**39.** *McAlpine,* 762 P.2d at 94–95.

**40.** The court protests that, "[i]n truth, the court simply strikes the first sentence of section .320 and gives to the second sentence of that section its plain meaning." This protest rings hollow because it misses the point: as the court tacitly acknowledges in declining to give the entirety of the original version of section .320 the same permissive meaning it now attributes to the section's second sentence, the second sentence's "plain meaning" in the severed version of the section is a meaning that the sentence could not plausibly have been intended to have in its original context. The court's "sever and reinterpret" approach is precisely the bootstrapping that *Gottschalk* and similar cases forbid. In effect, the court starts with a law that says "No language but English may ever be used." The court severs some text: "No language but English may ever be used." It then gives the remainder— "English may be used"—its plain meaning as severed and declares that, because the remainder is capable of standing on its own and—just like the original version—helps to promote English, the severed version has essentially the same purpose as the first and was therefore intended by the original drafters. This strikes me as a considerable reach.

**41.** *Zarnke,* 589 N.W.2d at 377.

**42.** *Gottschalk,* 575 P.2d at 296.

**43.** *Zarnke,* 589 N.W.2d at 372.

**44.** *Id.*

**45.** *Id.* at 372–73.

**46.** *Id.* at 373.

**47.** *Id.* at 379.

The supreme court reversed the intermediate court's severance ruling.[48] Although it accepted the state's description of the legislature's underlying intentions, the court roundly rejected the state's new theory of severance and reinterpretation, explaining its ruling as follows:

> At oral argument, the State suggested that the legislature's explicit intent as evinced by legislative history is *not* what appears to be most clear from a reading of that history. Instead, the State suggests that we should consider the legislature's implicit intent, which it believes was really an intent to enact legislation that would allow it to legislate to the limits of the constitution. . . .

> We might agree with the State that the legislature's implicit intent was to draft a statute that went to the limits of the constitution. However, that the legislature intends to pass statutes which are constitutional is always our starting point in such an inquiry as this. But were we to rewrite a statute whenever it failed constitutional muster in order to save it, using any means possible, the legislature would soon realize that it need not be concerned with constitutional limitations: the judiciary could always be relied upon to mend and mold its language to fit within constitutional constraints.[49]

Here, neither the initiative's severability clause nor ACL's commendable aspirations can dispel the conclusion that the weak and largely symbolic official-English law the court now adopts diverges radically from the restrictive and inflexible intentions manifested in the original initiative's deliberately sweeping and restrictive English-only requirements. As today's opinion makes clear, if the initiative's sponsors had wanted to propose a moderate and permissive official-English initiative, they would have had numerous examples to use as models—indeed, they still have those models and are free to propose them. Instead, the initiative's sponsors chose to propose a carefully crafted and elaborately structured measure that, the court concedes, clearly and unambiguously mirrored the nation's "most restrictively worded official-English law[s] to date." [50]

Today the court claims to have transformed the original initiative from a divisive, zero-tolerance English-only mandate into a unifying and permissive symbol of our common linguistic bond; yet in the same breath, the court declares that it sees no real change in the original initiative's basic meaning and primary intent. The court's goal may be laudable, but in my view, its vision fails. As I see it, the court's action is judicial legislation, pure and simple. I would hold that the original initiative "means what it says." [51]

## II. OVERBREADTH

Having reshaped section .320 to fit constitutional limits, the court all but ignores the overbreadth claims that address the initiative's other provisions; the court dismissively finds that these claims pose no realistic danger of chilling free speech and can safely be left for later challenges on an as-applied basis. I think that the court is correct in recognizing that its reinterpretation of section .320 will ultimately render many of the initiative's remaining provisions "superfluous or hortatory." But it seems wrong to assume that these provisions have been sufficiently disarmed to pose no lasting danger of a chilling effect. Because I would hold that the initiative must be struck in its entirety and because the court declines to address the remaining overbreadth claims at all, it would be pointless to discuss the claims in detail. But since I think that the court's resolution of the case should require it to address these claims, it seems appropriate to outline my reasons for believing that these claims warrant the court's immediate attention.

As a preliminary matter, I would note that to the extent that these claims have become hortatory and superfluous, their current status results from the court's decision that the

---

48. *Id.* at 373.

49. *Id.* at 379 (emphasis in original) (citation omitted).

50. *Ruiz*, 957 P.2d at 994 (quoting Arington, *supra* note 2, at 337).

51. *Campbell*, 536 P.2d at 111, *overruled on other grounds by Kimoktoak*, 584 P.2d at 31.

first sentence of section .320 can properly be severed. Before severing an invalid provision and declaring that the remainder of the statute can stand, the court has a duty to review the statute's remaining provisions and to determine whether they are actually valid and capable of standing on their own.[52] Because the court acknowledges that its ruling on section .320 renders other provisions of the initiative hortatory and superfluous, it should identify and strike those provisions as an integral part of its ruling on severance.

More importantly, in their present nebulous state, at least some of these provisions continue to pose the same obvious danger of chilling free speech that led the court to strike the first sentence of section .320. Like landmines left behind in the aftermath of a war, these provisions will continue to be a clear and present danger until they are identified, examined, and defused.

For example, in the absence of any further provision requiring the exclusive use of English, section .340(a)'s list of exceptions would at first blush seem meaningless and presumably harmless. Yet as long as they continue to stand as part of the literal law, these "exceptions" can hardly be counted on to be harmless. As already mentioned, even in section .320(a)'s absence, section .340(a) is capable of being read to stand on its own as an exclusive list of circumstances in which languages other than English may be used by the government. While we might be able to count on courts to understand that today's ruling makes these provisions superfluous, many members of the public—both within government service and outside of it—will not share that understanding and may conform their conduct to the literal terms of this statutory language.

Section .340(b) creates a separate problem by allowing members of the public to communicate with government officials in languages other than English, but only if their communications can be translated into English:

> An individual may provide testimony or make a statement to the government in a language other than English, if the individ-

ual is not an officer or employee of the government, and if the testimony or statement is translated into English and included in the records of the government.

Though originally designed as a narrow exception that would override section .320(b)'s English-only requirement by *allowing* English to be used if a translator could be found, now this subsection will surely be read and applied as a stand-alone provision that *requires* non-English communications to be translated even though the rule that justified the exception has been struck. As a logical matter, the exception should disappear with the rule; yet today's opinion seems to recognize section .340 as continuing to exist.

Section .350 vastly compounds the problem created by the holdover status of subsection .340(b):

> Sec. 44.12.350. Public accountability. All costs related to the preparation, translation, printing, or recording of documents, records, brochures, pamphlets, flyers, or other material in languages other than English shall be defined as a separate line item in the budget of every governmental agency, department, or office.

Though styled as an "accountability" provision, this section actually erects an appropriation requirement. By demanding that the costs of preparing all non-English government writings be accounted for by "separate line item in the budget of every governmental agency," subsection .350(b) ultimately means that no government writings can be prepared in a language other than English unless line-item funds have been appropriated for the preparation. Thus, although the court now recognizes that section .320 creates a permissible "category of unofficial or informal documents" that includes writings like a "note in Spanish from a teacher," "a letter from a city councillor in Yup'ik," or "a fisheries notice to be posted in English and Yup'ik," section .350 may well require all government workers, before sending or accepting such notes, letters, and notices, to locate the line-item money. And if the mon-

---

**52.** *See, e.g.,* SINGER, *supra* note 13, § 44:4, at 561–62 (remaining portion of severed statute must be "valid as a law by itself"); *McAlpine,* 762 P.2d at 94–95 (remaining portion of severed statute must be capable of standing on its own).

ey is not there, those writings would not be permitted. Although this provision certainly might have fit well with the initiative's original role as an English-only law, it has no legitimate justification in the reconstructed version and can only invite mischief.

The lingering concerns posed by these provisions are further exacerbated by the overarching language of section .380:

> Sec. 44.12.380. Private cause of action authorized. Any person may bring suit against any governmental entity to enforce the provisions of AS 44.12.300–44.12.390.

In effect, this provision gives every person in Alaska a wildcard to sue—or to threaten suit—for enforcement of the initiative's requirements.

Although this private-prosecution function might have played a vital role in ensuring that the original initiative's broad requirements were enforced, now that the initiative no longer has any hard and fast requirements, it seems fair to wonder what will be left to enforce. The question is hardly moot: there is no reason to expect that Alaskans who hold strong views favoring the adoption of English as our only official language will hesitate to sue, or to threaten suit, based on their personal impressions of what the initiative means and requires. In many cases, these impressions will now reflect misperceptions stemming from the initiative's unsettled meaning in its just-adopted form. Because the initiative's newly proclaimed meaning creates no obvious rights that would be capable of being privately enforced, the only suits likely to be threatened under section .380 are suits triggered by the problematic provisions described above. The only effect section .380 seems capable of producing, then, is a chilling effect. And since the threat of suit can be as effective in chilling free speech as the suit itself, courts are not likely to see any sign of this chilling effect.

We have previously held that "[a] statute regulating speech is overbroad, and thus unconstitutional, 'when constitutionally protected conduct as well as conduct which the state can legitimately regulate are included within the ambit of [a] statute's prohibition.' " [53] We have further held that a court must engage in an overbreadth analysis when an individual whose own speech may be prohibited challenges a statute on its face " 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' " [54] The challenger must show that there is " 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.' " [55]

In considering whether the combined effect of the provisions discussed above creates a realistic danger that free speech will be chilled, we must start by bearing in mind the importance of our right to speak freely and by recognizing that, when First Amendment freedoms are at stake, "[t]he threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." [56] We must likewise consider the importance of the particular speech rights threatened, the scope of the threat, the class of persons affected, and the likelihood that the presence of a chilling effect might remain undetected.

Here, the right threatened—the right to communicate with government—is among the most vital of potential free-speech rights; the threatened deprivation could result in a lack of access to government services; and the two classes at risk are non-English-speaking citizens and government workers—both of which have a membership that is extremely vulnerable to deterrence by the

**53.** *Turney v. State,* 936 P.2d 533, 539 (Alaska 1997) (second alteration in original) (quoting *Marks v. City of Anchorage,* 500 P.2d 644, 646 (Alaska 1972)).

**54.** *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (quoting *Brockett v. Spokane Arcades,*

*Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)).

**55.** *Id.* (quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

**56.** *Marks,* 500 P.2d at 647 (citation omitted).

threat and would be particularly unlikely to seek redress if their rights were improperly chilled.

Considering these factors, as well as the systemic nature of the problem, I think that there are compelling reasons to believe that a realistic danger of a chilling effect does in fact exist. I would therefore conclude that, unless the court strikes the initiative in its entirety, it must review and decide the remaining overbreadth claims now.

## III. CONCLUSION

Because the initiative was carefully crafted in its entirety to prohibit or impermissibly chill the right to free speech, I would hold that it must be declared invalid in its entirety. Although I agree with the court's ruling that section .320 is unconstitutional, I dissent from its decision that the rest of the initiative can be saved.